RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0091p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
─────────────────

LIBERTARIAN PARTY OF OHIO; KEVIN KNEDLER;
AARON HARRIS; CHARLIE EARL,

        *Plaintiffs-Appellants,*

    *v.*

JON HUSTED, Secretary of State,

        *Defendant-Appellee,*

GREGORY A. FELSOCI,

        *Intervenor Defendant-Appellee.*

No. 14-3230

Appeal from the United States District Court
for the Southern District of Ohio at Columbus
No. 2:13-cv-00953—Michael H. Watson, District Judge.

Argued: April 22, 2014

Decided and Filed: May 1, 2014

Before: SUHRHEINRICH, GIBBONS, and COOK, Circuit Judges.

─────────────────

**COUNSEL**

**ARGUED:** Mark R. Brown, Columbus, Ohio, for Appellants. Bridget C. Coontz, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio for Appellee Husted. Steven W. Tigges, ZEIGER, TIGGES & LITTLE LLP, Columbus, Ohio, for Appellee Felsoci. **ON BRIEF:** Mark R. Brown, Columbus, Ohio, Mark G. Kafantaris, Columbus, Ohio, for Appellants. Bridget C. Coontz, Damian W. Sikora, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio for Appellee Husted. Steven W. Tigges, John W. Zeiger, Stuart G. Parsell, ZEIGER, TIGGES & LITTLE LLP, Columbus, Ohio, for Appellee Felsoci.

1

———————————

**OPINION**

———————————

JULIA SMITH GIBBONS, Circuit Judge.   Plaintiff-appellants in this case include the Libertarian Party of Ohio ("LPO"), a ballot-qualified political party in Ohio; Kevin Knedler, the LPO state executive committee chair; Aaron Harris, the LPO state central committee chair; and Charlie Earl, the LPO gubernatorial candidate for Ohio in 2014 (collectively referred to as the LPO).  The  LPO appeals the denial of its request for a preliminary injunction.  The LPO sought an order prohibiting defendant-appellee, the Ohio Secretary of State, Jon Husted, from enforcing section 3501.38(E)(1) of the Ohio Revised Code and thus restoring Earl to the ballot for the May 2014 primary election.  Also a party to the appeal is Gregory Felsoci, who intervened in the litigation.  Felsoci is the individual whose protest of the certification of LPO candidates resulted in Earl's removal from the ballot.[1]   On appeal, the LPO makes two challenges to the constitutionality of section 3501.38(E)(1): (1) on its face the statute's employer disclosure requirement violates the First Amendment, and (2) its enforcement violates the LPO's due process rights.  We affirm.

I.

To appear on a general election ballot in Ohio, a political party must participate in the primary.  The Ohio Constitution requires that "[a]ll nominations for elective state . . .  offices shall be made at direct primary elections or by petition as provided by law."  Ohio Const. art. V, § 7.  Ballot-access statutes create the framework for this constitutional mandate.  Those statutes impose various requirements on minor parties seeking to appear on primary (and thus general election) ballots.  Over the last ten years, the LPO has struggled to become and remain a ballot-qualified party in Ohio through frequent litigation.  The LPO has successfully challenged Ohio laws burdening its access to the ballot in three prior lawsuits.  *See Libertarian Party v. Blackwell*, 462 F.3d 579 (6th Cir. 2006); *Libertarian Party of Ohio v. Husted*, No. 2:11-cv-722, 2011 WL 3957259 (S.D. Ohio Sept. 7, 2011), *vacated as moot*, 497 F. App'x 581 (6th Cir.

———————————

[1]At the outset, we deny Felsoci's motion to dismiss and strike his attached appendix which is duplicative of the relevant parts of the record.

2012); *Libertarian Party of Ohio v. Brunner*, 567 F. Supp. 2d 1006 (S.D. Ohio 2008). As a result of the litigation, the LPO has fielded candidates for local, state-wide, and federal offices in primary and general elections from 2008 to 2013. In the instant lawsuit the LPO previously was successful in obtaining injunctions barring enforcement of an Ohio residency requirement for petition circulators and barring retroactive application of S.B. 193, which voided the Secretary's directives recognizing minor parties as ballot-qualified and changed the criteria for a minor party to obtain ballot access.

The LPO's third motion for a preliminary injunction is the subject of this appeal. Before introducing the facts forming the basis for the LPO's motion, however, a summary of the relevant Ohio ballot-access statute is useful.

A candidate may gain access to a general election only if he or she participates in the primary. *See* Ohio Const., art. V, § 7. To gain access to the primary, candidates must file declarations of candidacy accompanied by petitions ninety days before the primary election. Ohio Rev. Code § 3513.05. If a candidate declares a candidacy for state-wide nomination or election as a candidate of a minor party, then the petition must be supported by the signatures of at least five hundred qualified electors who are members of the same political party as the candidate. *Id.* A petition consists of separate "petition papers," each containing signatures of electors of only one county. *Id.* And only one person, a circulator, can circulate each petition paper. Section 3513.05 further notes that petition papers are governed by a distinct statutory provision, section 3513.38 of the Ohio Revised Code. *Id.*

According to section 3513.38, the signatures provided for on the petition papers must be made by electors qualified to vote on the candidacy or issue which is the subject of the petition. The facts of qualification are determined as of the date the petition is filed. Ohio Rev. Code § 3501.38(A). Signatures must be in ink and include the location of the signer's voting residence, which is the address appearing on the registration records at the board of elections. Ohio Rev. Code § 3501.38(B)−(C). A person shall sign only his or her name, and a person may not authorize another to sign for him or her, so long as he or she is not unable to physically sign because of disability. Ohio Rev. Code §§ 3501.38(D), 3501.382.

Section 3513.38 also includes a provision detailing requirements for circulators, which, because it forms the basis for the instant appeal, is quoted at length:

On each petition paper, the circulator shall indicate the number of signatures contained on it, and shall sign a statement made under penalty of election falsification that the circulator witnessed the affixing of every signature, that all signers were to the best of the circulator's knowledge and belief qualified to sign, and that every signature is to the best of the circulator's knowledge and belief the signature of the person whose signature it purports to be or of an attorney in fact acting pursuant to section 3501.382 of the Revised Code. On the circulator's statement for a declaration of candidacy or nominating petition for a person seeking to become a statewide candidate or for a statewide initiative or a statewide referendum petition, *the circulator shall identify the circulator's name, the address of the circulator's permanent residence, and the name and address of the person employing the circulator to circulate the petition, if any.*

Ohio Rev. Code § 3501.38(E)(1) (emphasis added).[2]  Petition circulators comply with this disclosure requirement by filling in an employer information box located on the petition paper. Section 3501.38(E)(1) requires the disclosure of all funding sources, irrespective of whether the circulator is working as the servant employee or as an independent contractor of the source. *See State ex. rel. Linnabary v. Husted*, No. 2014-0359, 2014 WL 1317512, at *4 (Ohio Apr. 3, 2014). Further, if a circulator knowingly permits an unqualified person to sign a petition paper or permits a person to write another's name on a petition paper, the petition paper itself is invalid. Ohio Rev. Code § 3501.38(F).

After the candidate collects a number of petition papers containing a sufficient number of signatures and files the declaration of candidacy and accompanying petition with the Secretary of State, the Secretary then transfers the petition papers to the county boards of elections, where they are open to public inspection. Ohio Rev. Code § 3513.05. The boards certify the validity or invalidity of each signature and return their determinations, along with the petition papers, to the Secretary. *Id.* The Secretary then aggregates the totals to determine whether the candidate satisfied the minimum number of required valid signatures and, if the required minimum is met, certifies the candidate to the ballot. But, according to section 3501.38(L) of the Ohio Revised Code, the boards "shall not" invalidate a petition on the basis that the submitted petition does not

---

[2]The employer disclosure requirement was added by Am. Sub. H.B. 1 (2004).

satisfy petition requirements.   Rather, the Secretary has the power to determine "all other matters" involving the validity or invalidity of the petition papers.  Ohio Rev. Code § 3513.05.

Section 3501.39 of the Ohio Revised Code provides that the "secretary of state . . . shall accept any petition described in section 3501.38 of the Ohio Revised Code unless . . . [a] written protest against the petition or candidacy, naming specific objections, is filed, a hearing is held, and a determination is made by the election officials with whom the protest is filed that the petition is invalid, in accordance with any section of the Revised Code providing a protest procedure."  Section 3513.05 provides a procedure for protests of violations of its requirements. Any qualified elector who is a member of the same political party as the candidate and who is eligible to vote at the primary election in which the candidate seeks nomination may protest the candidacy of any person filing a declaration of candidacy for party nomination or for election. *Id.*  Protests must be filed at least seventy-four days before the primary, in writing, and with the election officials with whom the declaration of candidacy and petition were filed—normally, for state-wide elections, the Secretary of State.  *Id.*  A protest triggers a hearing before the Secretary (or another election official with whom the declaration of candidacy was filed), who fixes a time and provides notice to the candidate and protester.  *Id.*  The Secretary (or, again, another election official with whom the declaration of candidacy was filed) hears the protest and makes a final determination as to the validity of the declaration for candidacy and accompanying petition.  *Id.* If the Secretary "find[s] that such candidate . . . has not fully complied with [the requirements set forth in] this chapter, the candidate's declaration of candidacy and petition shall be determined to be invalid and shall be rejected."  *Id.*

II.

While the LPO was attempting to enjoin Husted's enforcement of S.B. 193, it was also engaged in the preparation of its declarations of candidacy and accompanying petitions to be filed by the February 5, 2014 deadline.   In November 2013, Oscar Hatchett, a professional petition circulator, contacted Robert Bridges, the vice-chair of the executive committee and political director for the LPO.  Hatchett offered the LPO his services to assist LPO candidates to qualify for the 2014 primary ballot.  Bridges hired Hatchett, dba Easy Access Petitions, to collect signatures for its candidates, including Earl, Steven Linnabary, who sought to file a declaration

of candidacy on behalf of the LPO for attorney general, and Sherry Clark, who sought to file a declaration of candidacy on behalf of the LPO for lieutenant governor.

Hatchett collected 636 signatures for candidates Earl and Clark and 743 signatures for Linnabary. Hatchett billed the LPO for his services as Easy Access Petitions, receiving payment and reimbursements of approximately $1,785 for signatures for Earl and $500 or more for signatures for Linnabary. Hatchett shipped his completed petition papers to Bridges without completing the employer information box. Hatchett asked Bridges whether he wanted that portion of the petition papers filled out. Bridges did not give Hatchett any instructions as to whether to fill out the employee information box, although Bridges believed that it was not necessary to do so because Hatchet was an independent contractor. Indeed, at all times, Hatchett was an independent contractor, and not an employee of the LPO.

Like Bridges, Hatchett also believed it was unnecessary to fill in the employee information box. Hatchett had been a professional circulator circulating petitions in Ohio for approximately ten years. During that time, he circulated at least 10,000 petition papers and never completed the employer statement box on any petition paper. He was unaware of any of his signatures being invalidated for failure to complete the employer statement box. In mid-January, the LPO terminated its contractual relationship with Hatchett due to a lack of funds and, presumably, because he had gathered well more than the requisite 500 signatures for the prospective LPO candidates.

Hatchett was not the only circulator circulating petitions in support of the LPO candidates. On January 8, 2014, the LPO found itself, in Knedler's words, in "crisis mode." The district court had just issued a preliminarily injunction, ordering Husted to provide the LPO and its candidates access to the 2014 primary and general elections. The LPO had little more than a month until the February 5 filing deadline to collect the requisite signatures for its candidacy petitions, and it confronted the worst weather in 60 years. So the LPO reached out to "some folks outside of the party in the shadows"—including "Tea Party people," "Ron Paul people," independents, and members of the Ohio Democratic Party. Others were reaching out too. Ian James, the owner of The Strategy Network, "a grassroots consultancy and advocacy firm," spoke

with Chris Redfern, the chairman of the Ohio Democratic Party about collecting signatures for the Libertarian candidates.

And additional petitions began to be circulated, but not only by the LPO or its affiliates. For example, Sara Hart collected approximately 241 signatures for Earl and Clark and submitted them to Bridges. She also did not complete the employer information box. The LPO did not pay Hart for her services. Nor did Hatchett, although Hatchett did know Hart from previous petition circulation efforts. Thus, Hart was likely working as an independent contractor for some unspecified third party. Furthermore, on January 28, 2014, an organization, Ohioans for Liberty, paid $12,000 to The Strategy Network to supervise, manage, and organize efforts to collect signatures for Earl and other Libertarian candidates. The Strategy Network directed four of its employees and interns to collect signatures on behalf of LPO candidates. But neither Ohioans for Liberty nor The Strategy Network is affiliated with the LPO. Ohioans for Liberty is a 501(c)(4) organization, and the vast majority of its funding comes from the Ohio Democratic Party—to the tune of $828,000. Although James avowedly did not know the affiliation between Ohioans for Liberty and the Ohio Democratic Party, it is reasonable to infer that the Democratic Party was financing the circulation of petitions for LPO candidates.

These efforts, particularly Hatchett's, garnered enough signatures to confidently place the LPO candidates on the primary ballot. On December 30, 2013, Linnabary filed with Husted, pursuant to section 3513.05 of the Ohio Revised Code, a declaration of candidacy and nominating petition for attorney general, consisting of 94 separate petition papers and 968 signatures. And on February 4, 2014, one day before the filing deadline, Earl and Clark filed with Husted a declaration of candidacy and nominating petition for governor and lieutenant governor, consisting of 191 separate petition papers and 1,478 signatures.

On February 6, 2014, these petition papers were transmitted to local boards of elections to determine the validity of the signatures. For Linnabary, the local boards returned 92 valid part-petitions containing 591 valid signatures. For Earl and Clark, the local boards returned 190 valid part-petitions containing 830 valid signatures, well in excess of the 500 required by section 3513.05 of the Ohio Revised Code. On February 18, after Husted received the part-petitions and

determinations of validity from the local boards of election, he certified Linnabary, Earl, and Clark as LPO candidates for the May 6 primary ballot.

At that point Gregory Felsoci, the intervenor-defendant-appellee in this case, entered the picture. Felsoci resides in Akron, Ohio, works as a carpenter, and considers himself a member of the LPO. Felsoci's interest in Ohio ballot-access law apparently began after a Republican friend, John Musca, showed him an unidentified document which Musca claimed to have found in a local coffee shop. In the evidentiary hearing before the district court, Felsoci could not describe the nature of the document Musca showed him and was unable to explain why he believed the truth of the assertions the document contained. He said he believed it because he read it. As far as Felsoci understands, what he read and consequently believed was that the LPO was gathering "votes" without disclosing that those who gathered them were being paid to do so. Musca then asked Felsoci whether he would be willing to stand by his conviction that wrongdoing had occurred and agree to be contacted by someone to discuss pursuing the matter further. Felsoci acquiesced. Soon afterward, the Zeiger, Tigges, and Little law firm contacted Felsoci and offered its assistance. Felsoci is not paying for his representation by the Zeiger law firm; he is unaware who is paying for it. Characterized as a "guileless dupe" by the district court, Felsoci likely is the tool of the Republican Party.[3]

On February 21, three days after Husted certified Linnabary, Earl and Clark as LPO candidates for the primary ballot, Felsoci filed a protest against the certification of Earl and Clark.[4] Felsoci argued that section 3501.38(E)(1) of the Ohio Revised Code requires independent contractors, not just employees, to complete the employer information box and thus the LPO candidates failed to comply with the employer disclosure requirement. He also asserted that the circulators were not members of the LPO as required by section 3513.05 of the Ohio Revised Code. Husted referred the protest to Bradley Smith, a hearing officer, to conduct a

---

[3]The district court came to this conclusion: "[I]t seems fair to acknowledge the inference, especially in light of the fact that Felsoci's attorneys elicited evidence demonstrating that the Ohio Democratic Party, or its operatives or supporters, provided assistance to Plaintiffs in their efforts to gather petition signatures to qualify for the Ohio May 2014 primary ballot."

[4]Two other individuals filed protests which are not of instant concern: Tyler King also filed a protest against the certification of these three candidates but withdrew his protest fairly quickly. And Carl Akers filed a protest against Linnabary only.

hearing and issue a report and recommendation as to the disposition of the protest. Smith conducted the hearing on March 4, 2014. Persons associated with the LPO, Ohioans for Liberty, and The Strategy Network testified. Smith issued his report on March 7, 2014.

In that report, Smith concluded that all of the challenged petition circulators—Hatchett, Hart, and others—satisfied the requirement of section 3513.05 of the Ohio Revised Code of being members of the same political party as the candidate for whom they were circulating petitions because they had not voted in any primary for the last two years. Smith also concluded that because Hatchett and Hart failed to provide the name and address of the person or entity who compensated them in the employer information box on the petition papers, the signatures gathered for Earl and Clark failed to comply with section 3501.38(E)(1) of the Ohio Revised Code. Accordingly, Smith recommended that all the petition papers submitted by Hatchett and Hart be ruled invalid.

Husted adopted Smith's report and recommendation the same day it was made. Pursuant to his power under section 3513.05 of the Ohio Revised Code, Husted held that the signatures gathered for Linnabary by Hatchett and the signatures gathered for Earl and Clark by Hatchett and Hart were invalid, and, as a result, neither Linnabary nor Earl and Clark had the requisite five hundred valid signatures to be eligible for nomination at the May 6, 2014 primary election as LPO candidates for the offices of attorney general, governor, and lieutenant governor, respectively.

This was the first occasion on which enforcement of the employer disclosure requirement had resulted in the disqualification of a statewide candidate. In the absence of a protest, Husted's practice had been not to check petitions to see whether the employer name and address were omitted.

Husted's invalidation of the signatures and disqualification of the candidates from the ballot has serious consequences for the LPO, which go beyond the May primary. First, having failed to qualify for the primary ballot, Earl, Clark, and Linnabary cannot appear on the ballot for the November 2014 general election. Therefore, it is extremely unlikely that the LPO will

receive two percent of the votes cast in the 2014 gubernatorial race.[5]  Owing to amendments to Ohio's ballot-access statute enacted in S.B. 193, the LPO will very likely lose its recognition as a political party in Ohio.  And to requalify as a political party, the LPO would have to file with the Secretary a party formation petition that is (1) supported by a number of signatures equaling one percent of the total vote at the 2014 gubernatorial election (amounting to more than 38,500 signatures, assuming no change in voting numbers from the 2010 gubernatorial election); (2) signed by not fewer than five hundred qualified electors hailing from each of at least a minimum of one-half of the congressional districts in the state (currently eight); and (3) filed at least one hundred and twenty-five (125) days before the general election the party plans to contest.  *See* Ohio Rev. Code § 3517.01(A)(1)(b).  Furthermore, the LPO would *also* have to meet the petition requirements imposed by section 3501.38 of the Ohio Revised Code—which it failed to meet for 500 signatures—for more than 38,500 signatures.

To avoid this result, the LPO again sought the interposition of the courts.  Linnabary filed suit in the Supreme Court of Ohio, seeking a writ of *mandamus* to compel Husted to certify his candidacy as LPO candidate for attorney general and restore his name to the ballot.  *See Linnabary*, 2014 WL 1317512, at *1.  The court concluded that Husted's interpretation of "employing" in section 3501.38(E)(1) of the Ohio Revised Code to cover employment relationships with independent contractors did not clearly disregard applicable law.  *Id.* at *5.  The court also held that section 3501.38(E)(1) does not comprehend a substantial-compliance standard and that strict compliance is therefore required.  *Id.* at *7.  Accordingly, the court denied the writ of *mandamus*.  *Id.*

The LPO and Earl, by contrast, looked again to the federal district court.  On March 7, 2014, the same day as Husted disqualified the LPO from the May primary ballot, the LPO filed a second amended complaint, a third motion for a preliminary injunction, and a motion for a temporary restraining order.  In its second amended complaint, the LPO lodged three additional constitutional claims under 42 U.S.C. § 1983.  First, in count six, the LPO alleged that the requirement under section 3501.38(E)(1) of the Ohio Revised Code that circulators disclose their

---

[5]See Ohio Am. Sub. S.B. 193 § 4(B), 130th G.A. (2013) ("A political party that polls for its candidate for Governor at least two per cent but less than twenty per cent of the entire vote cast for that office at the 2014 general election remains a minor political party for a period of four years after meeting that requirement.")

employers facially violates the First Amendment.  Second, in count seven, the LPO alleged that Husted's enforcement of that requirement by declaring their previously certified petition papers invalid violates the First Amendment as-applied.  Third, in count eight, the LPO alleged that a retroactive application and enforcement of section 3501.38(E)(1) of the Ohio Revised Code violates its rights under the Due Process Clause of the Fourteenth Amendment.  The LPO sought a declaration that section 3501.38(E)(1) is unconstitutional, both facially and as-applied, and a preliminary and permanent injunction prohibiting Husted from enforcing the statute as interpreted by him against the LPO with respect to the 2014 primary election.  Shortly thereafter, Felsoci moved to intervene.

The district court conducted a preliminary conference and an evidentiary hearing on the LPO's third motion for a preliminary injunction.  At the March 13, 2014 evidentiary hearing, the court heard the testimony of live witnesses, subject to cross examination.  The court heard additional testimony on March 14 and 17, 2014.

On March 19, the district court issued an opinion and order denying the LPO's third motion for a preliminary injunction.  The district court held that the LPO abandoned its due process claim and, moreover, that the claim lacked merit.  The court also found that the LPO was unlikely to succeed on the merits of its facial and as-applied First Amendment challenges.  After a summary analysis of the other factors to be considered in a motion for a preliminary injunction, *see Williamson v. Recovery Ltd. P'ship*, 731 F.3d 608, 627 (6th Cir. 2013), the district court concluded that each of them weighed  against granting injunctive relief.  The LPO gave notice of appeal.

The following day, on March 20, 2014, the LPO filed a motion with this court for an expedited appeal and an immediate injunction pending appeal providing that (1) Husted place Earl's name on the 2014 LPO primary ballot; (2) Husted be enjoined from printing the LPO primary ballots until the motion for an injunction pending appeal is resolved; and (3) Husted be directed to seek a waiver to the requirement that the ballots to be mailed to absent military personnel and overseas voters by March 22, 2014.  The LPO concomitantly filed in the district court a motion to stay its ruling pending the outcome of the emergency appeal and to enjoin Husted from printing paper ballots for the May 2014 primary election until after their appeal had

been determined and the Ohio Supreme Court had issued its decision in *State ex rel. Linnabary*. The district court denied the LPO's motion to stay pending appeal, as did this court. We did, however, direct the clerk to expedite the appeal of the district court's denial of the LPO's third motion for a preliminary injunction. Ohio's primary election is scheduled for Tuesday, May 6, 2014. *See* Ohio Rev. Code § 3501.01(E)(1).

## III.

"This court reviews the denial of a preliminary injunction for an abuse of discretion, examining findings of fact for clear error and legal conclusions *de novo*." *Autocam Corp. v. Sebelius*, 730 F.3d 618, 624 (6th Cir. 2013). "The reviewing court looks to the same four factors the district court considered: likelihood of success on the merits, irreparable harm to the movant in the injunction's absence, harm to others as a result of the injunction's issuance, and the public interest." *Id.* "When a party seeks a preliminary injunction on the basis of the potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). "With regard to the factor of irreparable injury, for example, it is well-settled that 'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Id.* (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)); *see also Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989) ("The Supreme Court has unequivocally admonished that even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief."). Thus, to the extent that the LPO can establish a substantial likelihood of success on the merits of its First Amendment claims, it also has established irreparable harm. *See Reno*, 154 F.3d at 288.

"Likewise, the determination of where the public interest lies also is dependent on a determination of the likelihood of success on the merits of the First Amendment challenge because 'it is always in the public interest to prevent the violation of a party's constitutional rights.'" *Id.* (quoting *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n,* 23 F.3d 1071, 1079 (6th Cir. 1994)); *see also Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1490 (6th Cir. 1995) ("[T]he public as a whole has a significant interest in . . . protection of First Amendment liberties."). "Accordingly, because the questions of harm to the parties and the

public interest generally cannot be addressed properly in the First Amendment context without first determining if there is a constitutional violation, the crucial inquiry often is, and will be in this case, whether the state action at issue is likely to be found constitutional." *Reno*, 154 F.3d at 288. And "[s]ince 'likelihood of success' is a legal question that this court reviews *de novo*, the effective standard of review for a denial of a preliminary injunction in this posture is also *de novo*." *Autocam*, 730 F.3d at 624 (citing *Bays v. City of Fairborn*, 668 F.3d 814, 819 (6th Cir. 2012)).

IV.

Before this court, the LPO makes only one First Amendment claim—that section 3501.38(E)(1) is unconstitutional on its face. The as-applied challenge pursued in the district court has thus been abandoned. *See Robinson v. Jones*, 142 F.3d 905, 906 (6th Cir. 1998) ("Issues which were raised in the district court, yet not raised on appeal, are considered abandoned and not reviewable on appeal.").

We recognize that the LPO's facial challenge is one of overbreadth. In the First Amendment context, the overbreadth doctrine permits a litigant to assert that a statute is facially invalid because the impermissible applications of the law are substantial when compared against the statute's plainly legitimate sweep. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 n.6 (2008); *see also Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973) ("Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression."). The LPO obviously would suffer a burden if it could not hire circulators to circulate petitions for its candidates attempting to qualify for the Ohio ballot. But the First Amendment speech that the LPO alleges is unconstitutionally burdened by section 3501.38(E)(1) is the petition circulation of paid circulators who are not before this court. The LPO maintains that the employer disclosure requirement chills the First Amendment activity of many paid petition circulators and cannot withstand judicial scrutiny.

We also note that the LPO's facial challenge focuses on the employer disclosure requirement's impact on paid circulators with respect to candidacy nominating petitions for

minor political parties, a subset of those circulators to whom the requirement applies.  Therefore, we review only the part of section 3501.38(E)(1) that requires circulators of candidacy or nomination petitions to disclose the name and address of the person employing them, if any.

The Supreme Court has repeatedly said that disclosure requirements do not impose a ceiling on speech.  *See, e.g., McCutcheon v. Fed Election Comm'n*, 134 S. Ct. 1434, 1459 (2014) (plurality); *Citizens United v. Fed Election Comm'n*, 558 U.S. 310, 366 (2010).  Although they may burden the ability to speak, disclosure requirements do not prevent anyone from speaking.  *Citizens United*, 558 U.S. at 366 (internal citations and quotation marks omitted).  In the election context, disclosure requirements serve the important function of transparency, which is essential to the fair contestation for political office.  Disclosure requirements provide "the electorate with information about the sources of election-related spending" and "help citizens make informed choices in the political marketplace."  *Id.* at 367 (internal citations and quotation marks omitted).  Thus, in the election context, although disclosure requirements may burden speech protected by the First Amendment, they are not automatically subject to strict judicial scrutiny.  Rather, the Supreme Court has reviewed First Amendment challenges to disclosure requirements in the electoral context under what it has termed "exacting scrutiny."  *John Doe No. 1 v. Reed*, 130 S. Ct. 2811, 2818 (2010) (citing *Buckley v. Valeo*, 424 U.S. 1, 64 (1976) (per curiam) ("Since *NAACP v. Alabama*, we have required that the subordinating interests of the State [offered to justify compelled disclosure] survive exacting scrutiny") (alteration in original) (internal citation omitted); *Citizens United*, 558 U.S. at 366 ("The Court has subjected [disclosure] requirements to 'exacting scrutiny. . . .'" (quoting *Buckley*, 424 U.S. at 64)); *Davis v. FEC*, 554 U.S. 724, 744 (2008) (governmental interest in disclosure "'must survive exacting scrutiny'" (quoting *Buckley*, 424 U.S. at 64)); *Buckley v. American Constitutional Law Foundation, Inc. (ACLF)*, 525 U.S. 182, 204 (1999) (finding that disclosure rules "fail[ed] exacting scrutiny")).  "That standard 'requires a substantial relation between the disclosure requirement and a sufficiently important governmental interest.'"  *Reed*, 130 S. Ct. at 2818 (quoting *Citizens United*, 558 U.S. at 366−67) (internal quotation marks omitted).

"Exacting scrutiny," despite the name, does not necessarily require that kind of searching analysis that is normally called strict judicial scrutiny; although it may.  To withstand "exacting

scrutiny," the Supreme Court has explained, "'the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights.'" *Id.* (quoting *Davis*, 554 U.S. at 744). The burden a ballot-access disclosure requirement imposes on a First Amendment right may be sufficiently serious as to require strict scrutiny. *See ACLF*, 525 U.S. at 192 n.12 (explaining that the standard of review applied to paid circulator requirements "is entirely in keeping with the now-settled approach that state regulations impos[ing] severe burdens on speech . . . [must] be narrowly tailored to serve a compelling state interest." (citing *ACLF*, 525 U.S. at 206 (Thomas, J., concurring in judgment) (alterations in original) (internal quotation marks omitted)). However, it may not be. *See, e.g., Reed*, 130 S. Ct. at 2820 n.2 (explaining that the standard of review applied differs from strict scrutiny). If a disclosure requirement in a ballot-access provision chills First Amendment speech, the level of scrutiny to be applied depends on the severity of the burden. *Compare ACLF*, 525 U.S. 192 n.12, 194−95, 200, *and Meyer v. Grant*, 486 U.S. 414, 420−23 (1988), *with Reed*, 130 S.Ct. at 2821; *see also Citizens for Tax Reform v. Deters*, 518 F.3d 375, 383 (6th Cir. 2008) (recognizing the "sliding-scale" analysis).

## A.

We turn then to an examination of the burden placed upon paid circulators for minor parties by the disclosure requirement. Initially, we note that circulating petitions is core political activity. *See Meyer*, 486 U.S. at 422. And we look to the LPO's description of the chill it asserts the disclosure requirement places on paid circulators: "[R]equiring disclosure of funding sources makes speech and association risky for those who want to support minor parties and unpopular causes." From there the LPO's brief moves on to an examination of the evidentiary record in this case. We do the same.

The evidentiary record in the district court included the full transcript of the administrative hearing on Felsoci's protest. Three items in the administrative record have relevance. First, Hatchett was asked the following by counsel for Felsoci:

> Q. Sir, you've always understood that you could circulate petitions only as long as you did not affiliate with a particular political party? A. Yes. *Q. All right. And you always understood that an affiliation with a particular political party would substantially restrict the opportunities you would have to make money circulating*

*petitions. A. Yes, sir.* Q. So it's fair to say you have never been a member of a political party. A. I am unaffiliated, yes."

Second, during the administrative hearing, an attorney appeared on behalf of The Strategy Network to state the objections of its employees and volunteered the following proffer on behalf of Ian James:

> Specifically, if [James] were asked these questions he would give these answers: . . . Were you involved in organizing, managing, and supervising the circulators of signatures for the – of petitions for signatures of the Earl and Clark campaign? He would give the answer yes. Would being compelled to disclose the identities of persons with whom you communicated regarding the management, organization, and supervision of the signature-gathering for the Earl/Clark campaign alter how you communicate in the future? He would answer yes. . . . Would compelled disclosure of identities of such persons and your communications with them make them less likely to become involved—make you, rather, less likely to become involved in such activities in the future? He would answer yes. Would compelled disclosure of the identities of such persons and your communications with them make it less likely that others would ask you to become involved in such activities in the future? He would answer yes. As part of your work in political campaigns, do you depend on your ability to attract like-minded associates willing to engage with you in such political activities? He would answer yes. Would compelled disclosure of the identities of such persons and your communications with them . . . negatively affect your ability to attract such associations and form such associations in the future. He would answer yes."

All employees of The Strategy Network disclosed their employment on the petitions they submitted.

Third, despite the attorney's lodging of objections on his behalf, James did indeed appear at the administrative hearing and was called to testify by Felsoci. His testimony recounted his status as a proud Democrat and his discussion with Democratic Party officials about how obtaining signatures for Earl would harm the Republican candidate. And he described his efforts to obtain signatures for the LPO. Counsel for LPO asked James no questions relating to the earlier proffer, and he gave no testimony relevant to any burden on paid circulators.

Prior to the district court's evidentiary hearing, the LPO submitted the affidavit of Paul Frankel. Frankel is both a Libertarian party official living in Alabama and a self-described independent ballot-access contractor. He avers that he has directed and participated in hundreds

of signature drives for candidates and initiatives.  Frankel offers his opinion that hiring paid circulators is more difficult when states require that they disclose the source of their payments. He notes that paid circulators work for different candidates and causes and want to preserve anonymity of the sources "to insure future business."  And he indicates that funding sources like to remain anonymous and do not like to pay circulators who must disclose their funding sources. He particularly mentions that funding sources with Democratic or Republican ties do not want their funding of Libertarian Party circulators known and are less likely to pay circulators for Libertarian Party candidates if they know the information will be disclosed.  From this, he concludes: "Forcing candidates, parties and circulators to disclose their funding sources places a significant and severe burden on parties' and candidates' abilities to retain circulators."

At the evidentiary hearing in the district court, the Secretary presented the testimony of Brandon Lynaugh, co-owner of the public affairs firm Strategic Public Partners.  Lynaugh's testimony related both to whether the disclosure requirement chilled the work of paid circulators and the governmental interest in preventing fraud, which we discuss later.  The district court relied heavily on his testimony.  With respect to the disclosure requirement, the district court accurately described it as follows:

> SPP has run nine statewide issue campaigns and has coordinated efforts to collect signatures for campaign petitions in Ohio.  SPP has participated in the collection of more than one million signatures. . . . Lynaugh also testified that, in the industry, there is no ambiguity as to whether a paid circulator was required to complete the employer information box on part petitions. He was not aware of any instance of a paid petition circulator refusing to provide the information and stated that the disclosure requirement did not prevent him from obtaining the circulators he needed for his petition efforts. Further, Lynaugh indicated he had never heard of harassment of the companies he hired to circulate petitions as a result of the disclosures. Similarly, no commercial petition-circulating firms ever expressed to him that the disclosure requirement impaired their ability to hire individual petition circulators.
>
> In addition, Lynaugh testified that in his experience, commercial petition-circulating firms are not concerned about which side of an issue they work on and opined the ability to obtain signatures for a variety of issues is an indication of talent. He gave an example. Specifically, during one petition drive, one half of SPP worked for one candidate and the other half worked for his opponent. Lynaugh also expressed that transparency as to who is paying for petition circulation is advantageous because both the press and public expect it in this day and age.

Hatchett's testimony at the administrative hearing indicated his willingness to fill out the part of the petition form indicating his employment. No other evidence at the hearing before the district court bears on the issue of chill to circulators who must disclose their employment.

Reviewing the state administrative hearing and the evidentiary hearing before the district court, the relevant evidence of chill—whether to paid circulators generally or to those who circulate on behalf of minor party candidates—can best be described as scant. There is no record of any harassment or other efforts to dissuade circulators from circulating petitions. The proffer by James's attorney is not evidence, and James was not questioned about the issue when he in fact did testify. Hatchett's fleeting testimony about his understanding with respect to whether affiliation with a political party would restrict his employment opportunities says more about the attorney's leading questions than it does about what Hatchett himself thought. And Hatchett indicated to Bridges his willingness to fill in the disclosure information. The Frankel affidavit is conclusory and general. It is not based on Ohio's particular employer disclosure requirement and does not include any assurance that the activity of paid circulating is the same throughout the country. Lynaugh's specific knowledge and his experience, which includes experience in Ohio, speak directly to the issue and support a finding that there is no chill to circulator activity arising from the employer disclosure requirement.

Furthermore, when we assess the chill apt to flow from Ohio's employer disclosure requirement, we note that the disclosure is not made by the circulator to the voter. Rather, the disclosure is made by the circulator when the petition is filed, after the signatures are gathered. So while the core First Amendment activity of communicating with voters is occurring, the disclosure requirement plays no part. The circulator does not directly lose anonymity with the voter whose signature is being solicited. Also, the requirement itself is for an employer name and address only. Unless the political organization directly employs circulators, the employer will probably be a firm with no obvious political affiliation. No payment amounts are included. To be sure, seeking any information about a circulator has some potential, however small, to reduce willingness to engage in circulating. But other than that general observation, little else suggests that chill has occurred or is likely to occur as a result of the requirement. It is also worth noting that the disclosure requirement has been in effect for almost ten years. Yet the

record suggests that paid circulator activity is apparently common and that a variety of sources in Ohio provide the service. The only piece of evidence suggesting that the situation is different for minor parties is the Frankel affidavit, which, as previously noted, is general, conclusory, and does not relate specifically to Ohio. The LPO itself experienced no difficulty in obtaining paid circulators on short notice during a harsh winter. Overall, the LPO has provided "scant evidence" that Ohio's employer disclosure requirement for paid circulator places any burden whatsoever on circulators of petitions for candidacy nominations. *Cf. Reed*, 130 S. Ct. at 2821 (finding "scant evidence" that a state public records act allowing disclosure of signatories to referendum petitions would chill First Amendment speech).

B.

We turn to the state's interest in the requirement at issue. Section 3501.38(E)(1) was enacted in 2004 after Ralph Nader's disqualification from the presidential ballot that year. The disqualification was accompanied by findings of substantial fraud among paid circulators, and the record here includes the hearing examiner's extensive factual determinations. The fraudulent activity of Nader circulators was a major factor in the disclosure requirement's enactment.

Evidence before the district court on the state's interest also included the testimony of Matthew Damshroder, Deputy Assistant Secretary of State and Director of Elections since 2011. According to Damshroder, the employer information requirement helps deter fraud and also to detect it. It encourages employers of circulators to educate the circulators about applicable law and to hire individuals who will not reflect negatively on them. The information also helps if followup is necessary, because employers are often easier to contact than circulators. The information enables the Secretary of State's Office to cross-check with campaign expenditure reports and thus contributes to overall reporting compliance. Damshroder explained that the Secretary of State lacks resources to examine part petitions for compliance with the requirement. Thus, it relies on protests to uncover noncompliance. This practice accounts for the fact that the disqualification of LPO candidates is the first time the requirement had been enforced resulting in disqualification of a statewide candidate.

Testimony bearing on the governmental interest also came from Lynaugh. Lynaugh described instance of cheating by circulators and recalled circulator frauds detected by law

enforcement in 2006 and 2009. He testified that circulators can commit fraud by obtaining names and addresses from a phone book, and he was aware of one instance where a circulator was caught doing that in the last year. He was unaware of any instance in which a volunteer circulator committed fraud and called the difference of risk of volunteer fraud versus paid circulator fraud "night and day."

Taking all this testimony together, it appears that the employer disclosure requirement serves substantial and legitimate state interests. The governmental interest is far more than theoretical since Ohio has experienced fraud by paid circulators. The most notable instance of fraud occurred during the circulation of petitions for a minor party candidate, Ralph Nader. The requirement serves an ongoing function of deterring fraud and facilitating its detection.

C.

When we fit this case within the analytical framework established by Supreme Court precedent, we see that the burden imposed on core First Amendment activity is largely theoretical and speculative. And evidence exists suggesting that there is no significant burden at all. *Cf. Reed*, 130 S.Ct. at 2821 (noting "scant evidence" that "only modest burdens" attended disclosure). The burden is thus insufficiently serious to require strict scrutiny of the statutory provision. *See id.* at 2820 (concluding that the disclosure requirement "is substantially related to the important interest of preserving the integrity of the electoral process"). Here, the state interest is substantial, legitimate, and supported by evidence of actual fraud. The record also includes evidence of the contribution the statute makes on an ongoing basis to serving the legitimate state interest. Under "exacting scrutiny" then there is a small burden on First Amendment activity coupled with an important and well-established governmental interest to which the disclosure requirement is substantially related. Therefore, application of "exacting scrutiny" does not render the employer disclosure requirement unconstitutional. *See id.* at 2820−21.

Before leaving the First Amendment issue, we consider how the principal authorities relied on by the LPO relate to and inform our conclusions. Perhaps the most helpful case for LPO is *ACLF*, which involved a facial challenge to a Colorado statute that required that proponents of initiatives report at the time of petition filing names, addresses, and county of

voter registration of all circulators, the amount paid to each circulator, and the amount paid per petition signature.  525 U.S. at 189.  Proponents were required to file on a monthly basis the names and addresses of each paid circulator and the amount of money paid and owed to each circulator during the month.  *Id.*  The circulator disclosure provision was challenged along with requirements that all circulators be registered voters and that circulators wear identification badges stating their names and whether they were volunteers or paid.  *Id.* at 188−89.  If they were paid, the badge also had to include the name and phone number of their employer.  *Id.* at 188.  The Supreme Court ruled that the registration and badge requirements violated the First Amendment and also invalidated the provisions of the final and monthly report requirements that related to disclosures about individual circulators.  *See id.* at 197−204.  With respect to paid circulators, the Supreme Court said,  "[W]e agree with the Court of Appeals appraisal: Listing paid circulators and their income from circulation forc[es] paid circulators to surrender the anonymity enjoyed by their volunteer counterparts, no more than tenuously related to the substantial interests disclosure serves, Colorado's reporting requirements, to the extent they target paid circulators, fai[l] exacting scrutiny."  *Id.* at 204 (alterations in original) (internal citations and quotation marks omitted).

The result in *ACLF* certainly requires a very close look at the LPO's First Amendment challenge.  Indeed, we must be vigilant in scrutinizing all First Amendment challenges.  But ultimately *ACLF* is not controlling, nor does the LPO suggest that it is.  Instead, differences exist between the two cases that dictate a different result here.  No single distinction is determinative, but together they point to upholding Ohio's employer disclosure requirement.  The context of *ACLF* is an initiative campaign, and the Court itself noted that ballot initiatives do not pose the same risk of corruption that paying money on behalf of candidates does.  *Id*. at 203 ("We note, furthermore, that ballot initiatives do not involve the risk of '*quid pro quo*' corruption present when money is paid to, or for, candidates."); *see also Meyer*, 486 U.S. at 427−28 (citing *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 790 (1978) ("The risk of corruption perceived in cases involving candidate elections . . . simply is not present in a popular vote on a public

issue.")).[6]   While Ohio's disclosure requirement also applies to paid circulators circulating petitions for ballot initiatives, that is neither our context nor the object of the LPO's overbreadth challenge, and so we do not consider that aspect of the statute. *See Yazoo & M.V.R. Co. v. Jackson Vinegar Co.*, 226 U.S. 217, 219−20 (1912) ("Of course, the argument to sustain the contention is that, if the statute embraces cases such as are supposed, it is void as to them, and, if so void, is void *in toto*. But this court must deal with the case in hand, and not with imaginary ones. It suffices, therefore, to hold that, as applied to cases like the present, the statute is valid.").

Moreover, the record in *ACLF* contained no evidence that paid circulators we more apt to commit fraud than volunteer circulators, and the Court was unwilling to assume the fact "absent evidence to the contrary." 525 U.S. at 203. The record here, however, includes not only such evidence but also evidence of actual fraud involving paid circulators. And the *ACLF* disclosure itself—in monthly and final reports—both contained more information than is required here (payment amounts) and, there, the information disclosed was more visible to the public than a part-petition submitted on behalf of a candidate. Finally, an important part of the Supreme Court's analysis in *ACLF* relates to other measures by which Colorado seeks to deter fraud and diminish corruption. *See id.* at 203−04. The LPO does not suggest that other measures employed by Ohio figure in the analysis.

We note too that facts are not insignificant in determining the outcomes of First Amendment cases. So the entire record here plays a role in differentiating this case from *ACLF*. Our court stressed this point in *Citizens for Tax Reform v. Deters*, 518 F.3d 375 (6th Cir. 2008): "[T]he question is fact-intensive, given the 'sliding scale' analysis outlined by the Supreme Court in *Meyer*, *Buckley* and other decisions." *Id.* at 383 (citing *Lee v. Keith*, 463 F.3d 763, 768 (7th Cir. 2006) (describing the Supreme Court's flexible approach in similar First Amendment cases as a "sliding scale")). A determination that a challenged disclosure requirement unconstitutionally burdens speech protected by the First Amendment on one record does not compel us to conclude the same of a different disclosure requirement on another record. The

---

[6]While recognizing the differing contexts between ballot initiatives and candidacy nominations, we do not suggest that ACLF's principles are wholly inapplicable to candidate petitions. *See Nader v. Blackwell*, 545 F.3d 459, 476 (6th Cir. 2008).

Supreme Court has cautioned several times that there is "no litmus-paper" test separating valid ballot-access provisions from invalid interactive speech restrictions, *ACLF*, 525 U.S. at 192, and that there is "no substitute for the hard judgments that must be made," *id.* (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)). And in making those hard judgments, we must look to the record before us.

Perhaps the case that the LPO urges us most strongly to follow is our own *Deters* precedent, in which this court invalidated Ohio's prohibition of compensation for circulators on a per-signature or per-volume basis. 518 F.3d at 388. Yet *Deters* provides little help to the LPO. Instead *Deters* demonstrates the exact approach we employ here: an intensive examination of the record to determine the weight of the burden on petition circulation. While the *Deters* court concluded that the Ohio statutory requirement at issue in that case would diminish petition circulation because the "requirement would make proposing and qualifying initiatives more expensive . . . and . . . professional coordinators and circulators would likely not work under a per-time-only system," *id.* at 385, the LPO offers no convincing evidence that the employer disclosure requirement at issue in this case would significantly diminish petition circulation, if at all.

The LPO's reliance on *McIntyre v. Ohio Elections Commission*, 514 U.S. 335 (1995), is also unavailing. In *McIntyre*, the Supreme Court invalidated an Ohio statute prohibiting the distribution of campaign literature that did not contain the name and address of the person or campaign official issuing the literature. *Id.* at 357. But *McIntyre* is not controlling. There, the Supreme Court concluded that Ohio sought to "indiscriminately outlaw[] a category of speech"—namely, anonymous political speech. *Id.*; *see also id.* at 338 n.3. Here, by contrast, Ohio's employer disclosure requirement for paid circulators of candidacy nomination petitions does not prohibit a category of speech. *See McCutcheon*, 134 S. Ct. at 1459 (noting disclosure requirements "do not impose a ceiling on speech"); *Citizens United*, 558 U.S. at 366 (disclosure requirements do not prevent anyone from speaking). If the disclosure requirement burdens any speech protected by the First Amendment—a burden for which the LPO has adduced scant evidence—then that burden is only indirect and far less severe than the burden imposed by the statute considered in *McIntyre*. And it is precisely along these lines that the *McIntyre* Court

distinguished its holding from *Buckley*, 424 U.S. at 75−76, in which the Supreme Court upheld disclosure requirements of independent expenditures in excess of a certain threshold to the Federal Election Commission:

> Though such mandatory reporting [in *Buckley*] undeniably impedes protected First Amendment activity, the intrusion is a far cry from compelled self-identification on all election-related writings. A written election-related document—particularly a leaflet—is often a personally crafted statement of a political viewpoint. Mrs. McIntyre's handbills surely fit that description. As such, identification of the author against her will is particularly intrusive; it reveals unmistakably the content of her thoughts on a controversial issue. Disclosure of an expenditure and its use, without more, reveals far less information. It may be information that a person prefers to keep secret, and undoubtedly it often gives away something about the spender's political views. Nonetheless, even though money may "talk," its speech is less specific, less personal, and less provocative than a handbill—and as a result, when money supports an unpopular viewpoint it is less likely to precipitate retaliation.

*McIntyre*, 514 U.S. at 355. Like the disclosure requirement upheld in *Buckley*, the employer disclosure requirement is a "far cry" from a blanket prohibition on all anonymous campaign literature. While we recognize that the employer disclosure requirement necessarily negates the total anonymity of paid circulators of candidacy nomination petitions, the requirement's chill of speech protected by the First Amendment is far less than the freeze-out which the *McIntyre* Court confronted. Absent record evidence suggesting otherwise, we do not see that *McIntyre* provides the guidance the LPO believes it does.

Accordingly, we hold that the LPO is not likely to succeed on the merits of its First Amendment overbreadth challenge to section 3501.38(E)(1).

## V.

The LPO also lodges a due process claim against the enforcement of section 3501.38(E)(1). As with its First Amendment claim, the LPO fails to establish a substantial likelihood of success on the merits of its due process challenge. The LPO submits that section 3501.38(E)(1)'s disclosure requirement is void for vagueness because it failed to provide adequate notice of what conduct it prohibited. "[I]mprecise laws can be attacked on their face under two different doctrines." *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999) (plurality). First, is the overbreadth doctrine, which is the basis of the LPO's First Amendment facial

challenge. "Second, even if an enactment does not reach a substantial amount of constitutionally protected conduct, it may be impermissibly vague because it fails to establish standards . . . that are sufficient to guard against the arbitrary deprivation of liberty interests." *Id.* "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012) (citing *Papachristou v. Jacksonville*, 405 U.S. 156, 162 (1972)). "A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *Id.* (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)). A rule or regulation is unconstitutionally vague if it misleads the individuals it regulates into thinking that their conduct is not proscribed. *See Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1048 (1991). "The question is not whether discriminatory enforcement occurred here, as we assume it did not, but whether the Rule is so imprecise that discriminatory enforcement is a real possibility." *Id.* at 1051.

The void-for-vagueness doctrine is concerned with "two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Fox*, 132 S. Ct. at 2317 (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972)). The strictness of our vagueness scrutiny is proportionate to the burden that the law imposes on those whom it regulates. *See Morales*, 527 U.S. at 55 (plurality); *see also Fox*, 132 S. Ct. at 2318 (stating that the abrupt regulatory change was especially concerning because the regulations at issue in that case "touch upon 'sensitive areas of basic First Amendment freedoms'" (quoting *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964))); *id.* at 2319 (noting that lack of fair notice is especially troubling when the regulatory agency imposes a $1 million fine for the violation). "When speech is involved, rigorous adherence to [the fair-notice] requirements is necessary to ensure that ambiguity does not chill protected speech." *Fox*, 132 S. Ct. at 2317.

The LPO's void-for-vagueness challenge centers on the term "employing" in section 3501.38(E)(1). The provision requires disclosure of the "name and address of the person

*employing* the circulator." Ohio Rev. Code § 3501.38(E)(1) (emphasis added). The LPO maintains that term "employing" is vague because it connotes the common-law master-servant relationship and therefore did not provide adequate notice that "employing" could be applied to independent contractors. This argument is unconvincing. "Employ," as the term is commonly used in this context, means simply "to use or engage the services of," which covers both common law master-servant relationships and independent-contractor-client relationships. Webster's Ninth New Collegiate Dictionary 408 (9th ed. 1991).

Perhaps vagueness would have been a serious issue had the Secretary interpreted "employing" in any statutory provision to cover some broader range of conduct not associated with use of services. But the LPO offers no evidence of such an interpretation. "[A] statute will be struck down as facially vague only if the plaintiff has demonstrate[d] that the law is impermissibly vague in all of its applications." *Green Party of Tenn. v. Hargett*, 700 F.3d 816, 825 (6th Cir. 2012) (alteration in original) (internal quotation marks omitted). The LPO has not made such a demonstration. Accordingly, the LPO's vagueness challenge predicated on the term "employing" fails.[7]

Separately, the LPO argues that the Secretary's enforcement of the disclosure requirement violated due process because the LPO lacked sufficient notice that the Secretary would enforce the disclosure requirement against it. The LPO stresses that section 3501.38(E)(1) had not been previously enforced and that in 2006 and 2007 the Secretary issued two directives instructing local boards of elections not to invalidate part-petitions when the employer identification box was left incomplete. The LPO's insufficient-notice argument could be construed in two ways; both collapse.

If, on the one hand, the LPO contends that it had insufficient notice that its petition signatures would be invalidated as a consequence of Hatchett's failure to comply with the disclosure requirement, then that argument fails. The due process concern of notice goes to "fair notice of *conduct* that is forbidden or required." *Fox*, 132 S. Ct. at 2317 (emphasis added). That

---

[7]We note that the Ohio Supreme Court recently put this question of vagueness to rest when it interpreted the term to "appl[y] to all paid circulators, regardless of whether they are employees or independent contractors." *Linnabary*, 2014 WL 1317512, at *4.

the LPO was surprised by the enforcement does not necessarily show that the LPO did not know what was required.

On the other hand, the LPO's principal suggestion may be that the Secretary adopted a policy of non-enforcement that assured it that Hatchett and Hart's failure to complete the employer information box was not, in fact, unlawful. This argument relies almost exclusively on the Supreme Court's 2012 decision in *FCC v. Fox Television Stations*—a case we have yet to consider. *Fox* concerned the FCC's treatment of television broadcasts containing expletives and nudity. Title 18, section 1464 of the United States Code prohibits broadcasts of expletives and nudity and specifies the applicable penalties. *Id.* at 2312. From the 1970s until 2004, FCC guidance explicitly stated that passing or fleeting expletives or nudity would not be punished. Then, in 2004, the FCC issued a decision sanctioning NBC for singer Bono's use of the word "f***ing" during the 2003 Golden Globe Awards, thereby breaking from its previous enforcement position. It declared that "any use" of the "F-word" would be considered explicit and therefore indecent. The FCC then applied the new policy to other broadcasts by Fox and ABC, despite the fact that these broadcasts had aired well before the issuance of the Golden Globes order. The FCC declined to fine Fox, but fined 45 ABC affiliates $27,500 each for the broadcast it aired. *Id.* at 2315−17. Fox and ABC sued. The Supreme Court analyzed Fox and ABC's challenges to the enforcement under the void-for-vagueness doctrine. It held:

> The Commission's lack of notice to Fox and ABC that its interpretation had changed so the fleeting moments of indecency contained in their broadcasts were a violation of § 1464 as interpreted and enforced by the agency fail[ed] to provide a person of ordinary intelligence fair notice of what is prohibited. This would be true with respect to a regulatory change this abrupt on any subject, but it is surely the case when applied to the regulations in question, regulations that touch upon sensitive areas of basic First Amendment freedoms.

*Id.* at 2318 (alteration in original) (internal citation and quotation marks omitted). The LPO suggests that the Secretary committed a regulatory change as abrupt as that at issue in *Fox* and that the Secretary cannot show that "a person of ordinary intelligence" would have understood that circulators operating as independent contractors were required to disclose their clients.

The LPO cannot build its due process claim on *Fox*. Unlike in *Fox*, the LPO cannot demonstrate a formal policy change equivalent to the FCC's policy change. Here, there was no

policy change; it was always the case that under Ohio law paid candidacy nomination petition circulators were required to disclose their employers. The LPO adverts to two directives from Husted's predecessors to suggest there was a change of enforcement policy. In 2006, the Secretary issued a directive instructing the board of elections: "Do not invalidate a part-petition if the employer information statement . . . is blank or incomplete . . . ." Ohio Secretary of State Directive 2006-58 (Aug. 21, 2006). And in 2007, the Secretary issued a directive containing this exact same language in context of a referendum on a state senate bill. Ohio Secretary of State Directive 2007-14 (Sept. 10, 2007). But these directives do not establish a policy change; rather, they are entirely consistent with the statutory framework at baseline. Section 3501.38(L) of the Ohio Revised Code instructs that the boards "shall not" invalidate a petition on the basis that the petition form does not satisfy petition requirements. And section 3513.05 makes clear that, apart from the petition signatures, the Secretary has the power to determine all questions regarding the validity of the petition papers. The Secretary's directives therefore did little more than restate the applicable law to the boards of elections. They made no statement regarding the Secretary's own enforcement policy as to section 3501.38(E)(1). Much less do they prove that the Secretary had adopted a policy of non-enforcement of the requirements of section 3501.38(E)(1) prior to the events leading up to this case. And, furthermore, the LPO points to no record evidence that they actually relied on these directives in the decision not to complete the employer information box.

Thus, the LPO can establish no analogue to the FCC's pre-Golden Globes enforcement policy. In contrast to the fleeting expletives doctrine and the FCC's abrupt change in *Fox*, the LPO does not point to any non-enforcement policy of the Secretary's office from which the Secretary's enforcement of section 3501.38(E)(1) marks an abrupt change. Thus, the LPO simply cannot establish that they lacked notice as to what conduct was forbidden. *Cf. Fox*, 132 S. Ct. at 2317. The forbidden conduct was clear; that it would be enforced against them was surprising. But the history of non-enforcement of section 3501.38(E)(1) and the LPO's surprise at its enforcement against them do not establish the basis for a due process vagueness claim. What matters is the LPO cannot convincingly maintain that it lacked notice of what conduct was required. (In fact, their First Amendment overbreadth challenge is predicated on paid circulators

being well aware of the requirement.)   Accordingly, the LPO fails to demonstrate a substantial likelihood of success on the merits of its due process claim.

### VI.

We recognize that absent injunctive relief, the disqualification of the LPO from the 2014 Ohio primary ballot and general election ballots represents a severe and irreparable injury to the LPO.  Without a gubernatorial candidate on the general election ballot, given the effect of S.B. 193, the LPO in all likelihood will lose its status as a ballot-qualified party in Ohio.  We note that the LPO has struggled to become and remain a ballot-qualified party in Ohio, and we acknowledge that this decision entails that their efforts must continue still.  But we also note that we decide one case at a time, on the record before us.  In so doing, we preserve the First Amendment's primary place in our democracy over the long run.

"When a party seeks a preliminary injunction on the basis of the potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor." *Reno*, 154 F.3d at 288.  It is also the determinative factor here.  Because the LPO has failed to establish a likelihood of success on the merits of its constitutional claims, we affirm the denial of its third motion for preliminary injunction.