*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

LEAGUE OF WOMEN VOTERS OF MICHIGAN,
PROGRESS MICHIGAN, COALITION TO CLOSE
LANSING LOOPHOLES, and MICHIGANDERS
FOR FAIR AND TRANSPARENT ELECTIONS,

   Plaintiffs-Appellants,

v

SECRETARY OF STATE,

   Defendant-Appellee,

and

DEPARTMENT OF THE ATTORNEY GENERAL,

   Intervening Defendant-Appellee.

FOR PUBLICATION
October 29, 2021
9:00 a.m.

No. 357984
Court of Claims
LC No. 21-000020-MM

LEAGUE OF WOMEN VOTERS OF MICHIGAN,
PROGRESS MICHIGAN, COALITION TO CLOSE
LANSING LOOPHOLES, and MICHIGANDERS
FOR FAIR AND TRANSPARENT ELECTIONS,

   Plaintiffs-Appellees,

v

SECRETARY OF STATE,

   Defendant-Appellee,

and

DEPARTMENT OF THE ATTORNEY GENERAL,

   Intervening Defendant-Appellant.

No. 357986
Court of Claims
LC No. 21-000020-MM

-1-

Before:  RONAYNE KRAUSE, P.J., and K. F. KELLY and CAMERON, JJ.

RONAYNE KRAUSE, P.J.

In these consolidated appeals, appellants in both cases claim an appeal by right of the July 12, 2021 opinion and order of the Court of Claims, which addressed the constitutionality of certain provisions of 2018 PA 608, granted summary disposition in part to plaintiffs, and dismissed the case.  We affirm in part and reverse in part.[1]

## I.  FACTS AND PROCEDURAL HISTORY

In 2018, sponsors of six statewide proposals to initiate laws and constitutional amendments submitted signed initiative petitions; three of those proposals qualified for the ballot.  Michigan voters passed all three:  (1) Proposal 1 legalized recreational marijuana,[2] (2) Proposal 2 enacted legislation to establish a legislative redistricting committee comprised of citizens,[3] and (3) Proposal 3 expanded voter options, including no-reason absentee voting and straight-ticket voting.[4] Two other proposals, involving earned sick leave and an increased minimum wage, would have been on the ballot had the Legislature not enacted them within 40 days of receiving the voters' petitions.[5]

Among the 400 bills submitted to Governor Rick Snyder in the 2018 lame duck legislative session was a bill to amend the Michigan Election Law, MCL 168.1 *et seq.*, to set new requirements regarding initiative petitions.[6]  On December 28, 2018, Governor Snyder signed into

---

[1] As discussed further below, this marks the second occasion these issues have come before this Court, as two of these plaintiffs filed a similar action in the Court of Claims in 2019, and raised comparable issues.

[2] See the Michigan Regulation and Taxation of Marihuana Act, MCL 333.27951 *et seq.*

[3] See *Citizens Protecting Michigan's Constitution v Secretary of State,* 503 Mich 42; 921 NW2d 247 (2018), affirming that Proposal 2 could appear on the ballot.

[4] See *League of Women Voters of Michigan v Secretary of State*, 333 Mich App 1; 959 NW2d 1 (2020), which discussed the subsequent amendments to the Constitution as a result of Proposal 3.

[5] The Michigan Constitution provides the Legislature with 40 days to enact any law, without amendment, that was proposed by initiative petition.  Const 1963, art 2, § 9.  The Legislature immediately amended the provisions and later sought an advisory opinion from our Supreme Court regarding the legislation, but our Supreme Court denied the requests.  *In re Advisory Opinion on 2018 PA 368 & 369 (House)* and *In re Advisory Opinion on 2018 PA 368-9 (Senate),* 505 Mich 884; 936 NW2d 241 (2019).

[6] Specifically, the bill sought to amend "sections 471, 477, 479, 482, and 544d (MCL 168.471, 168.477, 168.479, 168.482, and 168.544d), section 471 as amended by 1999 PA 219, section 477

law 2018 PA 608, which had immediate effect. 2018 PA 608 added a geographic requirement to MCL 168.471, which limited the total number of signatures to be used to determine the validity of a petition to no more than 15% from one congressional district.[7] Also, when filing petitions with the Secretary of State ("the Secretary"), submitters would be required to sort the signed petitions by congressional district and include a good-faith estimate regarding the number of signatures from each district.[8] 2018 PA 608 amended MCL 168.477, forbidding the Board of State Canvassers from "count[ing] toward the sufficiency of a petition . . . any valid signature of a registered elector from a congressional district submitted on that petition that is above the 15% limit described in [MCL 168.471]."

2018 PA 608 also amended MCL 168.482 to require that signatures be gathered on forms designated by congressional district rather than by county, which was the designation previously used.[9] Also, the amendment requires paid petition circulators,[10] before gathering signatures, to file an affidavit with the Secretary disclosing their non-volunteer status.[11] Additionally, the amendment mandates that new petition forms contain a checkbox for a circulator to indicate whether he or she is a paid circulator.[12] The petition forms also must contain a statement that, if a petition circulator fails to comply with the requirements, signatures obtained by that circulator are invalid and will not be counted.[13] Under the amendment, circulators who provide false information relating to their status as a paid circulator are subject to criminal prosecution for a misdemeanor.[14] 2018 PA 608 made other substantive changes to the Michigan Election Law, but those changes have not been challenged in this appeal.

On January 22, 2019, the Secretary, the chief election officer of the state,[15] asked Michigan Attorney General Dana Nessel for a formal opinion regarding the constitutionality of

---

as amended by 2012 PA 276, section 482 as amended by 1998 PA 142, and section 544d as amended by 1999 PA 218, and by adding sections 482a, 482b, 482c, and 482d." 2018 PA 608.

[7] Michigan is divided into 14 congressional districts. MCL 3.51a.

[8] MCL 168.471.

[9] MCL 168.482(4). See also MCL 168.544d.

[10] The statute defines a "paid signature gatherer" as "an individual who is compensated, directly or indirectly, through payments of money or other valuable consideration to obtain signatures on a petition as described in [MCL 168.471]." MCL 168.482d.

[11] MCL 168.482a(1).

[12] MCL 168.482(7).

[13] MCL 168.482(8).

[14] MCL 168.482c.

[15] MCL 168.21. See also Const 1963, art 5, § 3.

2018 PA 608.[16]  In OAG, 2019-2020, No. 7,310 (May 22, 2019), the Attorney General stated that the 15% geographic requirement violated the petition and amendment provisions of the Michigan Constitution because neither of those provisions restrict the number of signatures collected from one geographic region.  She also opined that the checkbox requirement did not further any asserted governmental interest and exposed circulators to the risk of "heat of the moment" harassment, such that it was unconstitutional.  The Attorney General additionally reasoned that no state interest was apparent in the requirement that the Secretary must receive a precirculation affidavit from paid circulators, particularly where the petitions will contain circulators' addresses.  She concluded that the affidavit requirement was not substantially related to Michigan governmental interests and was unconstitutional.  The Attorney General determined that the following sections that were unconstitutional could be severed from the remainder of the act:

- the portions of MCL 168.471, MCL 168.477, and MCL 168.482(4) involving the 15% geographic requirement;

- MCL 168.482(7) and MCL 168.482c, regarding the checkbox requirement; and

- MCL 168.482a(1) and (2), involving the precirculation affidavit.


In May 2019, the League of Women Voters ("the League"), Michiganders for Fair and Transparent Elections (MFTE),[17] and three individual plaintiffs filed suit in the Court of Claims against the Secretary, alleging that certain portions of 2018 PA 608, including the geographic requirement, checkbox, and precirculation affidavit, were unconstitutional.  In June 2019, the Michigan House of Representatives and the Michigan Senate (hereinafter "the Legislature") filed a separate action against the Secretary in the Court of Claims.  The Legislature likewise sought injunctive and declaratory relief, stating that, as the exclusive lawmaking body of Michigan, it would be harmed if the Secretary refused to enforce 2018 PA 608.  It asked the Court of Claims to declare that 2018 PA 608 was constitutional and to direct the Secretary to enforce the new law.

The Court of Claims ruled that the Legislature did not have standing, but opted to accept its pleadings as amici curiae briefs.  The Court of Claims held that the 15% geographic cap and the checkbox requirement were unconstitutional.  The Court rejected the plaintiffs' challenge to the affidavit requirements for paid signature gathers.

---

[16] Pursuant to MCL 14.32, the Attorney General gives opinions on questions of law posed by state officers.  Such opinions are not binding on the courts, *Traverse City School Dist v Attorney General (In re Proposal C)*, 384 Mich 390, 407 n 2; 185 NW2d 9 (1971), but "command the allegiance of state agencies."

[17] MFTE is a Michigan nonprofit corporation and a registered ballot question committee and was conducting a petition drive in 2020.

In an expedited[18] decision, this Court affirmed the Court of Claims' ruling that the 15% geographic cap and the checkbox requirement were unconstitutional, and that the Legislature lacked standing to bring the suit. This Court reversed regarding the affidavit requirements for paid signature gathers, ruling that the affidavit also ran afoul of the Constitution. *League of Women Voters of Michigan v Secretary of State*, 331 Mich App 156; 952 NW2d 491 (2020) (*LWV I*). Judge BOONSTRA dissented in part, and would have held that the Legislature had standing and that the checkbox requirement was constitutional. *Id.* at 156 (BOONSTRA, J., dissenting in part).

The parties in both cases appealed to our Supreme Court. Meanwhile, plaintiff MFTE had terminated its petition drive because of the COVID-19 pandemic. Eleven months after this Court's expedited opinion in *LWV I*, in an opinion by Justice VIVIANO, joined by Chief Justice MCCORMACK and Justices BERNSTEIN and CAVANAGH, our Supreme Court ruled that the case was moot because MFTE was not pursuing its ballot initiative and no other plaintiff had standing to pursue the appeal.[19] *League of Women Voters of Michigan v Secretary of State*, 506 Mich 561, 574-599; 957 NW2d 731 (2020) (*LWV II*). The *LWV II* Court took no position on the merits of the constitutional arguments, declining to examine the legal issues in the absence of a genuine controversy between adverse parties. *Id.* at 599 n 60. Beyond affirming this Court regarding standing, our Supreme Court otherwise vacated this Court's opinion in *LVW I*, commenting that the case "ha[d] been a procedural mess from the beginning." *Id.* at 589-590. In dissent, Justice MARKMAN commented that the Court's failure to address the legal issues was "likely only to generate further litigation and controversy." *Id.* at 612 (MARKMAN, J., dissenting).

Within weeks of the Supreme Court's order of dismissal in *LWV II*, further litigation commenced, Justice MARKMAN's prediction was borne out. Plaintiffs the League, Progress Michigan, Coalition to Close Lansing Loopholes, and MFTE, filed the instant declaratory action seeking injunctive relief in the Court of Claims.[20] Plaintiffs maintained that the amendments would increase the cost and difficulty of initiating a petition campaign. They asserted that the 15% geographic requirement was an unconstitutional restriction imposed on the citizens' rights of initiative, referendum, and/or amendment, particularly where the drafters of the 1963 Constitution expressly rejected geographic limitations for petitions. They also argued that the 15% geographic requirement violated the rights to free speech, association, and petition. They challenged the checkbox and affidavit requirements imposed on paid petition circulators, arguing that those also

---

[18] Our Supreme Court denied bypass, but directed that this Court expedite the appeal. *League of Women Voters v Secretary of State,* 505 Mich 931; 935 NW2d 888 (2019).

[19] The Court affirmed on alternate grounds this Court's ruling that the Legislature had no standing, ruling that the Legislature had not suffered harm from the Attorney General opinion, but commented that the Legislature has standing when it intervenes in a case where the Attorney General fails to defend a statute against a constitutional attack in court.

[20] Progress Michigan is a Michigan nonprofit corporation that sponsors statewide ballot questions. Coalition to Close Lansing Loopholes is a registered ballot question committee formed to support a proposal regarding lobbyists for the 2022 ballot. MFTE is planning a campaign finance reform ballot proposal for the 2022 ballot.

violated the right to free speech. Plaintiffs claimed that the invalidation of signatures for circulator errors was unconstitutional.

The parties stipulated to intervening defendant's intervention.[21] The Legislature also moved to intervene, but intervening defendant indicated that it would defend the entirety of 2018 PA 608, and would adequately represent the Legislature's interests. The Court declined to permit duplicative representation of the same interests and invited the Legislature instead to participate as amici curiae.

Plaintiffs moved for summary disposition pursuant to MCR 2.116(C)(9) and (C)(10), arguing that the 15% geographic requirement was an unconstitutional legislative amendment and violated the rights of free speech and association, and the right to petition under Const 1963, art 1, §§ 3, 5. Further, the new burdens on paid circulators violated Const 1963, art 1, §§ 3, 5. In her motion for partial summary disposition pursuant to MCR 2.116(C)(8) and (10), the Secretary contended that the signature invalidation provisions in MCL 168.482a(3), (4), and (8) did not violate plaintiffs' rights to free speech and association, or their right to petition, and MCL 168.482a(3) and (4) did not violate the due process clause.[22] Intervening defendant argued in its motion under MCR 2.116(C)(8) that plaintiffs had failed to state a claim, because the 15% geographic requirement assures the support of a broad coalition of voters across the state, and should be upheld because it does not severely burden First Amendment rights and advances a legitimate state interest. Also, it argued the checkbox and paid circulator affidavit requirements were consistent with the Legislature's charge to set the procedure for exercising the initiative and referendum powers. It also contended plaintiffs lacked standing. Plaintiffs responded in part that they had standing because they needed guidance as to their future conduct regarding petition drives so as to comply with 2018 PA 608 before spending millions of dollars.

In its opinion, the Court of Claims ruled in a substantially similar manner as it had in the first League case. It rejected intervening defendant's position that plaintiffs could not show a present legal controversy and thus decided that plaintiffs had standing to seek declaratory relief.[23] In considering the 15% geographic requirement, the court observed that the Constitution contains no limits on where voters' signatures may be gathered and concluded that the Legislature may neither curtail, nor place undue burdens on, constitutional rights contained in self-executing provisions of the Constitution. The court ruled that the 15% requirement impaired the citizens'

---

[21] To support its authority to intervene, intervening defendant cites the Attorney General's "power to defend the constitutionality of legislative enactments." *Attorney General v Michigan Pub Serv Comm'n*, 243 Mich App 487, 518; 625 NW2d 16 (2000).

[22] Those provisions in MCL 168.482a include the invalidation of signatures when a paid circulator has not filed a precirculation affidavit, a circulator uses a false address or provides fraudulent information, or the petition does not meet all requirements under MCL 168.482.

[23] Although intervening defendant has abandoned its argument that plaintiffs do not have standing, we take this opportunity to observe that it can be assumed that plaintiffs have standing where the ballot-committee plaintiffs are currently in the process of gathering support for several statewide petitions for the November 2022 ballot, and the League is comprised of voters who will support or oppose such petitions.

ability to circulate petitions and thus was unconstitutional. The court declined to decide plaintiffs' alternate argument that the 15% geographic requirement ran afoul of Article 1, §§ 3 and 5. With regard to the requirement that non-volunteer petition circulators check a box to indicate that they are paid, the court concluded that the checkbox did not substantially relate to an important governmental interest and that the compelled disclosure of a circulator's status discourages participation in the political process and thus inhibits core political speech. The Court of Claims also concluded that the invalidation of voters' signatures on the basis of a circulator's failure to comply with the checkbox requirement was unconstitutional. The court held that the precirculation affidavit requirement was constitutional because the burden on speech by way of the affidavit was less significant than that of the checkbox. The affidavit did not impose the same "heat of the moment" burden on the circulator as that of the checkbox requirement and the government had a valid interest in knowing the money spent on initiative petitions.

In tandem with its determinations, the court ruled that the offending portions of 2018 PA 608 could be severed from the act. The court therefore struck the 15% geographic requirement, the requirement that the Board of Canvassers reject signatures not in compliance with the 15% geographic requirement, and the condition that the petition forms should refer to congressional districts. The court also concluded that 2018 PA 608 was unconstitutional in its checkbox requirements, but determined that the affidavit requirement passed constitutional muster, and granted summary disposition accordingly.

Plaintiffs and intervening defendant filed the instant appeals. Plaintiffs quickly sought bypass, arguing that our Supreme Court should hear the matter immediately because the 2022 election may have as many as seven potential ballot proposals, all of which are hampered by uncertainty regarding the constitutionality of 2018 PA 608. Our Supreme Court once again denied bypass and again directed this Court to expedite its issue. *League of Women Voters of Michigan v Secretary of State,* __ Mich __ (Docket No. 163368, issued September 10, 2021). This Court consolidated the matters for review and ordered that the appeals would be decided on the briefs as filed. *League of Women Voters of Michigan v Secretary of State*, administrative order of the Court of Appeals, issued September 14, 2021 (Docket Nos. 357984, 357986).

## II. STANDARDS OF REVIEW

We review de novo a trial court's decision regarding a motion for a summary decision in a declaratory relief action. *Smith v Straughn,* 331 Mich App 209, 214; 952 NW2d 521 (2020). The constitutionality of a statute presents a question of law, which also is subject to a de novo standard of review. *Council of Organizations & Others for Education About Parochiaid v State*, 326 Mich App 124, 147; 931 NW2d 65 (2018).

## III. GENERAL PRINCIPLES OF CONSTITUTIONALITY

In the context of a constitutional analysis, courts generally construe a statute as not violating the Constitution unless it clearly appears that the statute is unconstitutional. *In re Int'l Transmission Co*, 304 Mich App 561, 569; 847 NW2d 684 (2014). In reviewing the constitutionality of statutes, courts should not "inquire into the wisdom of the legislation." *Oakland Cty v State of Michigan*, 325 Mich App 247, 260; 926 NW2d 11 (2018) (quotation marks and citation omitted).

Because 2018 PA 608 has yet to be enforced, arguments regarding its constitutionality fall within a facial challenge.[24] In such a challenge, "[t]he party challenging the facial constitutionality of an act 'must establish that no set of circumstances exists under which the [a]ct would be valid.' " *Straus v Governor*, 459 Mich 526, 543; 592 NW2d 53 (1999) (citing *US v Salerno*, 481 US 739, 745; 107 S Ct 2095; 95 L Ed 2d 697 (1987)). In keeping with the above legal framework, we begin with the presumption that 2018 PA 608 is constitutional and proceed with caution in determining whether plaintiffs have met their burden of proof to show that it is unconstitutional.

## IV. 15% GEOGRAPHIC REQUIREMENT

2018 PA 608 amended the Michigan Election Law to add the following 15% geographic limit:

> Not more than 15% of the signatures to be used to determine the validity of a petition described in this section shall be of registered electors from any 1 congressional district. Any signature submitted on a petition above the limit described in this section must not be counted. When filing a petition described in this section with the secretary of state, a person must sort the petition so that the petition signatures are categorized by congressional district. In addition, when filing a petition described in this section with the secretary of state, the person who files the petition must state in writing a good-faith estimate of the number of petition signatures from each congressional district. [MCL 168.471, as amended by 2018 PA 608.]

2018 PA 608 also amended the Michigan Election Law by indicating that signatures above the 15% geographic limit will not be counted by the Board of Canvassers:

> The board of state canvassers may not count toward the sufficiency of a petition described in this section any valid signature of a registered elector from a congressional district submitted on that petition that is above the 15% limit described in section 471. . . . [MCL 168.477(1), as amended by 2018 PA 608.]

In addition, 2018 PA 608 requires petitions to indicate in which congressional district the people who sign the petition reside. MCL 168.482(4), as amended by 2018 PA 608.

Intervening defendant argues that the 15% geographic requirement passes constitutional scrutiny and is a valid means to ensure participation from voters within the entire state. Intervening defendant adds that the Court of Claims erred in failing to recognize that the Legislature may enact

---

[24] A facial challenge is a claim that the law is "invalid in toto—and therefore incapable of any valid application . . . ." *Steffel v Thompson*, 415 US 452, 474; 94 S Ct 1209; 39 L Ed 2d 505 (1974) (citation and quotation marks omitted). In contrast, "[a]n as-applied challenge . . . alleges 'a present infringement or denial of a specific right or of a particular injury in process of actual execution' of government action." *Bonner v City of Brighton*, 495 Mich 209, 223 n 27; 848 NW2d 380 (2014) (2014) (citing *Village of Euclid Ohio v Ambler Realty Co*, 272 US 365, 395; 47 S Ct 114; 71 L Ed 303 (1926)).

laws that do not unduly burden the rights secured by self-executing constitutional provisions. Plaintiffs rejoin that the 15% geographic requirement violates the self-executing provisions of the Constitution.

The Court of Claims ruled that the geographic requirement violates the constitutional provisions regarding initiative petitions and constitutional amendments because those provisions are self-executing. We agree.

Constitutional provisions that are self-executing must not be burdened or curtailed by supplementary legislation. *Hamilton v Secretary of State,* 227 Mich 111, 125; 198 NW 843 (1924). Further, this Court liberally construes constitutional initiative and referendum provisions, through which the people reserve to themselves a direct legislative voice, to achieve their purposes. *Kuhn v Dep't of Treasury*, 384 Mich 378, 385; 183 NW2d 796 (1971), *Bingo Coalition for Charity— Not Politics v Bd of State Canvassers,* 215 Mich App 405, 410; 546 NW2d 637 (1996).[25]

To determine whether the 15% geographic limit survives a constitutional challenge, we first examine the constitutional provisions at issue to determine whether they are self-executing. A constitutional provision is deemed self-executing "if it supplies a sufficient rule, by means of which the right given may be enjoyed and protected, or the duty imposed may be enforced . . . " *Wolverine Golf Club v Secretary of State*, 24 Mich App 711, 725-726; 180 NW2d 820 (1970) (*Wolverine Golf Club I*) (quotation marks and citations omitted). "Whether a constitutional provision is self-executing is largely determined by whether legislation is a necessary prerequisite to the operation of the provision." *Id.* at 725.

Const 1963, art 2, § 9 governs initiatives and referenda, and provides in pertinent part:

> The people reserve to themselves the power to propose laws and to enact and reject laws, called the initiative, and the power to approve or reject laws enacted by the legislature, called the referendum. The power of initiative extends only to laws which the legislature may enact under this constitution. The power of referendum does not extend to acts making appropriations for state institutions or to meet deficiencies in state funds and must be invoked in the manner prescribed by law within 90 days following the final adjournment of the legislative session at which the law was enacted. To invoke the initiative or referendum, petitions signed by a number of registered electors, not less than eight percent for initiative and five percent for referendum of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected shall be required.

Our Supreme Court has ruled that Article 2, § 9 is self-executing constitutional provision. In *Wolverine*, when considering a statutory deadline mandating that referendum petitions be

---

[25] We acknowledge that intervening defendant urges this Court to apply a reasonable construction standard by citing *McQueer v Perfect Fence Co,* 502 Mich 276, 292 n 29; 183 NW2d 584 (2018). However, it is not clear that the reasonable construction standard should apply to these particular constitutional provisions in light of the express language in *Kuhn*. Nevertheless, under either standard, the geographic limit is unconstitutional as discussed below.

submitted to the Secretary ten days before a legislative session began, the Court held that the statutory timeline "restricts the utilization of the initiative petition and lacks any current reason for so doing." *Wolverine Golf Club v Secretary of State*, 384 Mich 461, 466; 185 NW2d 392 (1971) (*Wolverine Golf Club II*). Our Supreme Court later added that Article 2, § 9 was "an express limitation on the authority of the Legislature." *Woodland v Michigan Citizens Lobby*, 423 Mich 188, 214; 378 NW2d 337 (1985).

The other constitutional provision at issue, Const 1963, art 12, § 2, governs constitutional amendments, and provides in relevant part:

> Amendments may be proposed to this constitution by petition of the registered electors of this state. Every petition shall include the full text of the proposed amendment, and be signed by registered electors of the state equal in number to at least 10 percent of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected. Such petitions shall be filed with the person authorized by law to receive the same at least 120 days before the election at which the proposed amendment is to be voted upon. Any such petition shall be in the form, and shall be signed and circulated in such manner, as prescribed by law.

Our Supreme Court long has held that the principle that the Legislature cannot unduly burden self-executing constitutional procedures applies to Article 12, § 2, as well as Article 2, § 9. *Ferency v Secretary of State*, 409 Mich 569, 591 n 10; 297 NW2d 544 (1980). While reiterating that Article 12, § 2 is self-executing, our Supreme Court more recently observed that the Constitution specifically allows the Legislature to enact laws regarding the procedures regulating initiatives. *Citizens Protecting Michigan's Constitution v Sec of State*, 503 Mich 42, 63; 921 NW2d 247 (2018).

Our review therefore calls for us in part to ascertain whether the statutory requirements are merely procedural. We do not view a geographic requirement that limits voter participation in the initiative process as pertaining to "procedures" regarding initiatives. Rather, the geographic requirement places additional limitations on the electorate's power under the Constitution.

Article 2, § 9 and Article 12, § 2 do not depend on statutory implementation, despite the language in Article 2, § 9 indicating that the Legislature shall implement its provisions.[26] See *Woodland*, 423 Mich at 213. In fact, the provision's drafters expressly indicated that Article 2, § 9 was to be self-executing to preclude the Legislature from hindering the people's intent by failing to act. *Id.,* citing in part 2 Official Record, Constitutional Convention 1961, p. 3367. The constitutional provisions at issue reserve the initiative power to the people and provide the mechanism to invoke that power within their terms.

As self-executing provisions, Article 2, § 9 and Article 12, § 2 may not be encumbered by supplemental legislation. *Hamilton,* 227 Mich at 125. 2018 PA 608 levies an additional

---

[26] At its close, the section states that "[t]he legislature shall implement the provisions of this section." Article 2, § 9.

requirement of geographic location onto the existing self-executing constitutional provisions by setting a 15% limit of all signatures from any one congressional district. MCL 168.471, as amended by 2018 PA 608. Legislation that is supplementary to self-executing constitutional provisions " 'must be in harmony with the spirit of the Constitution and its object to further the exercise of constitutional right and make it more available, and such laws must not curtail the rights reserved, or exceed the limitations specified.' " *Wolverine Golf Club I*, 24 Mich App at 730, quoting *State ex rel Caldwell v Hooker*, 22 Okla 712, 718; 98 P 964 (1908). "Any statute which is both unnecessary for the effective administration of the initiative process and restrictive of the initiative right is unreasonable and thus unconstitutional." *Wolverine Golf Club I*, 24 Mich App at 735. The 15% geographic requirement does not make the initiative process more available to the electors, but instead curtails the rights of certain voters to have their signatures counted toward a ballot proposal. Put more simply, it will disenfranchise some electors and seriously burden the work of circulators—especially circulators who have limited resources.

Intervening defendant argues that Article 2, § 9 sets only a floor for the total number of signatures required, such that its plain language does not foreclose the Legislature from imposing a cap on the number of signatures. Where there is no existing cap in Article 2, § 9, the imposition of a cap would be an additional requirement, and it is an obligation that restricts, rather than furthers, the initiative process. The Legislature may not act to impose additional obligations on a self-executing constitutional provision. *Soutar v St Clair Co Election Comm*, 334 Mich 258, 265; 54 NW2d 425 (1952).

Further, intervening defendant is silent on the stifling effect of such a cap, instead arguing that the Legislature previously has imposed other requirements on initiative petitions, such as font size.[27] Intervening defendant theorizes that such requirements serve the public policy goal of readability. Nonetheless, and as pointed out by the Court of Claims, the increased readability of a petition aids voters, where a geographic limitation does not. Also, the limitation of voters' signatures on the basis of geographic location does not fall within the "form" of a petition and cannot be likened to the font size of text. Furthermore, changing the font size on a form may be an annoyance, but it requires little more than careful attention to detail; whereas the 15% geographic requirement restricts the number of people in a geographical area allowed to engage in political speech and burdens circulators by imposing burdensome sorting and estimation requirements that will also require additional expenditures of resources.

Indeed, it was not even disputed below that the new geographic requirement adds an impediment to the petition process. That the process would be more difficult was established by the unrebutted affidavits detailing the burdens imposed by the 15% geographic requirement. Other than arguing that the 15% geographic requirement would ensure that support for voter-proposed ballot measures would be "more evenly spread" across congressional districts, intervening defendant has not explained why a ceiling, rather than a floor, is necessary, or why that ceiling

---

[27] In *Stand Up for Democracy v Sec of State*, 492 Mich 588; 822 NW2d 159 (2012), our Supreme Court upheld the rule that the form of initiative petitions must strictly comply with the requirements of MCL 168.482, including the font size.

should be just 15%. Additionally, although intervening defendant states that the geographic requirement likely would increase the "total quantum of speech" on public issues, that argument is weakened by the fact that the geographic requirement is not a minimum, but instead is a preclusive cap on voters' signatures and the cap does not serve the state's proffered purpose.[28] It will instead have the effect of *reducing* the "total quantum of speech." Finally, it should go without saying that getting a measure onto the ballot in no way assures that the measure will actually be approved by the voters; it only ensures that the measure will be considered.

Intervening defendant also argues that a geographic requirement is common, citing the statistic that of 24 states with the citizen-initiative process, 14 impose "some kind" of geographic requirement. But intervening defendant does not indicate whether the geographic requirements of other states are a ceiling or a floor, or if they are designated by county or by congressional district. The general citation to other states' rules without reference to analogous provisions does not aid in our analysis of the legal issues before us, as illustrated by intervening defendant's reliance on cases from Utah and New York. The Utah Supreme Court concluded that a newly enacted geographic distribution requirement did not offend the right to initiate legislation in *Utah Safe to Learn-Safe to Worship Coalition Inc,* 94 P3d 217 (Utah, 2004), but the Utah requirement is not substantively similar to the 15% geographic requirement here because the Utah requirement was a threshold, not a cap, and the language of the Utah constitutional provision regarding initiatives made clear that the right of petition in that state was not unfettered. We also find unhelpful intervening defendant's citation to *Moritt v Governor of New York*, 42 NY2D 347, 350 (1977), where the New York Court of Appeals upheld as constitutional a geographic requirement for petitions for statewide office that operated as a floor, not a ceiling. The requirements in Utah and New York thus *required* support from a minimum number of voters; in contrast, 2018 PA 608 *prohibits* support from voters who exceed an arbitrary cap.

Intervening defendant also argues that the 15% requirement operates like the minimum threshold in Article 2, § 9 and Article 12, § 2, because, before 2018 PA 608, a voter's signature in excess of the minimum would not, in effect, contribute to placing an initiative on the ballot. A distinction exists, however, between being one of many petitioners above a minimum threshold as compared to being denied the opportunity to be a petitioner at all once the 15% cap is reached. As

---

[28] In its brief amicus curiae, the Legislature notes that the geographic requirement forces campaigns not to focus on dense population centers and thereby exclude other voters in less populous areas of Michigan. This argument may not be true where a proposal proponent could concentrate its efforts on the eight or nine most populous congressional districts and not the less populous districts. What is true, however, is that a cap on signatures would be more likely to exclude electors in the more populous districts as the 15% would be reached more rapidly in those districts.

-12-

noted by *LWV I*,[29] the 15% requirement's "effect would be to unconditionally deny untold numbers of registered voters the right to have their signatures counted . . . " *LWV I,* 331 Mich App at 182.[30]

Next, intervening defendant maintains that even if the 15% geographic requirement is not valid under Article 2, § 9, it is valid under the following language in Article 12, § 2: "Any such petition shall be in the form, and shall be signed and circulated in such manner, as prescribed by law." Intervening defendant argues that Article 12, § 2 thus creates "a wider lane" for the Legislature, citing *Consumers Power Co v Attorney Gen*, 426 Mich 1; 392 NW2d 513 (1986), which upheld a prohibition on signatures gathered more than 180 days before a petition's submission to the Secretary. But the reasonable—and rebuttable—presumption of staleness in *Consumers Power* is not on par with the nullification of otherwise timely and valid signatures merely because they exceed an arbitrary 15% geographic requirement. Also, the time limit in *Consumers Power* applied equally to all signatures more than 180 days old, whereas here the geographic limit bars only those signatures exceeding the 15% geographic limit. Further, a geographic requirement limiting otherwise valid petition signatures cannot be equated with petition signatures invalidated on the basis of incorrect addresses or signing dates. Additionally, the geographic requirement is not akin to mere legislative "details"[31] as contemplated by Article 12, § 2 and discussed in *Citizens for Capital Punishment v Secretary of State*, 414 Mich 913 (1982), cited by *Consumers Power*. We therefore decline to interpret Article 12, § 2 as expanding the legislative role relating to ballot petitions.

Although Michigan law requires candidates running for certain statewide offices to obtain signatures from at least half of Michigan's congressional districts,[32] no geographic requirements have ever applied to ballot petitions—until 2018 PA 608. In Michigan, the number of signatures required for a petition for statewide ballot depends on the number of votes cast in the most recent gubernatorial election. See Const 1963, art 2, § 9, Const 1963, art 12, § 2. In November 2018, nearly 4.3 million Michiganders cast votes in the midterm election. Therefore, to qualify for the 2022 ballot, sponsors must obtain over 212,000 signatures for a referendum, over 340,000 signatures for an initiative, or over 425,000 signatures for a constitutional amendment. In light of

---

[29] We recognize that *LWV I* has been vacated by our Supreme Court and therefore has no binding precedential value, but we nevertheless arrive at the same conclusion.

[30] Amicus curiae the American Civil Liberties Union further observes that 2018 PA 608's burdens will disproportionately fall on Black voters where over half of Michigan's Black voters currently are concentrated in just two of the state's 14 congressional districts.

[31] As noted in the record from the Constitutional Convention, "legislative details" are for the Legislature, but even so the Legislature cannot "thwart the popular will." *Woodland,* 423 Mich at 213, citing 2 Official Record, Constitutional Convention 1961, p 3367.

[32] See, e.g., MCL 168.53, regarding candidates running for Michigan Governor.

the 15% limitation, sponsors now must obtain signatures from over half of Michigan's congressional districts at a minimum.[33]

Our Constitution, however, contains no geographic distribution requirement in the text. Under the longstanding constitutional structure, a registered voter anywhere in Michigan could sign a petition and that signature would be counted in support. In contrast, under the 2018 PA 608 amendments, a voter's signature would not be counted if the geographic cap had been reached in his or her district. The new statutory bar to counting voters' signatures simply is not in line with the intent of the framers of our current Constitution. In construing a constitutional provision, the key objective is to give effect to the intent of the people who ratified the Constitution. *UAW v Green*, 498 Mich 282, 286; 870 NW2d 867 (2015). Although the plain meaning of the text is primary, the constitutional convention record also is relevant in determining the intent of the ratifiers. *Id.* at 287-288. The delegates to the 1961 Constitutional Convention considered adding a 25% geographic requirement to the Constitution. Proponents gave reasons similar to those offered here: to gain an informed electorate, and to prevent placement on the state ballot matters of only very local interest. Opponents stated that all signatures of voters should be equally counted, and the rule of "one person, one vote" should hold true for petition signors as well. The delegates voted down the proposed 25% geographic requirement (notably, the 25% proposed then was more generous than the 15% requirement in 2018 PA 608). 2 Official Record, Constitutional Convention 1961, p 3200-3201. Thus, it is manifest that the people chose not to add a geographic requirement to the Constitution. Had the people wanted to tie a geographic condition to the process, they would have done so.

We thus conclude that the geographic requirement does not survive constitutional scrutiny, as correctly concluded by the Court of Claims. We hold that the provision in MCL 168.471 imposing a 15% geographic limit, as amended by 2018 PA 608, establishes an unnecessary and unreasonable restraint on the constitutional right of the people to initiate laws. It therefore is unconstitutional. The provisions of other statutes involving the 15% geographic requirement, MCL 168.477 and MCL 168.482(4), likewise are unconstitutional. In light of this conclusion, we decline to discuss the alternate constitutional argument put forth by plaintiffs.

## V. PETITION CIRCULATORS

We next examine the requirements in 2018 PA 608 concerning petition circulators. MCL 168.482 now provides, in relevant part:

(7) Each petition under this section must provide at the top of the page check boxes and statements printed in 12-point type to clearly indicate whether the circulator of the petition is a paid signature gatherer or a volunteer signature gatherer.

(8) Each petition under this section must clearly indicate below the statement required under subsection (7) and be printed in 12-point type that if the petition

---

[33] Given the possible invalidation of signatures, sponsors would need to obtain many more signatures than the minimum, so they realistically would need to obtain signatures in more than seven districts.

circulator does not comply with all of the requirements of this act for petition circulators, any signature obtained by that petition circulator on that petition is invalid and will not be counted.

Consistent with the statement required by MCL 168.482(8), "[i]f a petition under [MCL 168.482] is circulated and the petition does not meet all of the requirements under [MCL 168.482], any signature obtained on that petition is invalid and must not be counted." MCL 168.482a(4). In addition, 2018 PA 608 imposes a further criminal penalty for a false indicator of a circulator's status: "The circulator of a petition under [MCL 168.482] who knowingly makes a false statement concerning his or her status as a paid signature gatherer or volunteer signature gatherer is guilty of a misdemeanor." MCL 168.482c.

MCL 168.482a(1) requires that "[i]f an individual who circulates a petition under section 482 is a paid signature gatherer, then that individual must, before circulating any petition, file a signed affidavit with the secretary of state that indicates he or she is a paid signature gatherer." If a paid circulator has not filed the affidavit, any signature obtained by the circulator is invalid, and if a circulator's petition does not meet the necessary requirements under § 482, any signature on that petition is invalid. MCL 168.482a(2) and (4).

## A. CHECKBOX

The Court of Claims concluded that the checkbox requirement does not substantially relate to a sufficiently important governmental interest and is therefore unconstitutional. Intervening defendant contends that the checkbox is constitutional, while plaintiffs align with the Court of Claims. We conclude that the checkbox requirement imposes little to no burden on political speech and substantially relates to an important governmental interest. The Court of Claims therefore erred in holding it to be unconstitutional.

Intervening defendant does not dispute that soliciting signatures in support of a petition, and the signing of such a petition, are protected speech under the First Amendment. *John Doe No 1 v Reed*, 561 US 186, 194-195; 130 S Ct 2811; 177 L Ed 2d 493 (2010). "The State, having 'cho[sen] to tap the energy and the legitimizing power of the democratic process, . . . must accord the participants in that process the First Amendment rights that attach to their roles.' " *Id.* (citation omitted). Nevertheless, intervening defendant posits that a sliding scale of scrutiny should be applied here, and offers the reasoning enunciated in the *Anderson-Burdick* test, which is named for *Anderson v Celebreeze*, 460 US 780; 103 S Ct 1564; 75 L Ed 2d 547 (1983), and *Burdick v Takushi*, 504 US 428; 112 S Ct 2059; 119 L Ed 2d 245 (1992). Under the test:

> A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights." [*Burdick*, 504 US at 434, quoting *Anderson,* 460 US at 789.]

-15-

Thus, "evenhanded restrictions that protect the integrity and reliability of the electoral process itself" are not invidious. *Anderson*, 460 US at 789 n 9.

As explained in *Timmons v Twin Cities Area New Party*, 520 US 351, 358; 117 S Ct 1364; 137 L Ed 2d 589 (1997), the *Anderson-Burdick* test involves a different scrutiny depending on the severity of the burden:

> When deciding whether a state election law violates First and Fourteenth Amendment associational rights, we weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary. Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions. [*Timmons*, 520 US at 358–359.]

Intervening defendant argues that the checkbox requirement is a lesser burden and thus should be analyzed under the *Anderson-Burdick* test. We agree; however, we conclude that the checkbox is constitutional even under the more exacting strict scrutiny test.

The First Amendment prohibits abridgement of "the right of the people to . . . petition the Government for a redress of grievances." US Const, Am I. The clauses of the First Amendment apply to the states through the Fourteenth Amendment. *J & J Construction Co v Bricklayers and Allied Craftsmen, Local 1*, 468 Mich 722, 729; 664 NW2d 728 (2003), citing *Whitehill v Elkins*, 389 US 54, 57; 88 S Ct 184; 19 L Ed 2d 228 (1967). In *Meyer*, the United States Supreme Court considered the constitutionality of a Colorado law making it a felony to pay people to circulate petitions. The trial court ruled that the burden on the sponsors was outweighed by the state's interests in ensuring a broad base of support for petitions and in eliminating a temptation to pad signatures. On appeal, the Tenth Circuit reversed, opining that the effect of the ban on paid circulators impeded the sponsors' dissemination of their views to the voters, curtailed discussions at the time of circulation of the petitions, and shrunk the "size of the audience." *Meyer,* 486 US at 419 (citations omitted).

The United States Supreme Court agreed, explaining that "[t]he circulation of an initiative petition of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change," rendering it "core political speech" under the First Amendment. *Meyer* 486 US at 421-422. It observed that the prohibition against paid circulators restricted political expression by limiting the number and hours of voices to carry the message, thereby limiting the available audience; in turn, that reduced the probability that enough signatures could be gathered to place the measure on the ballot. *Id*. at 422-423. Because the prohibition against paid circulators limited the power of the people to initiate legislation, it was subject to close scrutiny. *Id*. at 423. The Court concluded,

> The State's interest in protecting the integrity of the initiative process does not justify the prohibition because the State has failed to demonstrate that it is necessary to burden appellees' ability to communicate their message in order to meet its

concerns. The Attorney General has argued that the petition circulator has the duty to verify the authenticity of signatures on the petition and that compensation might provide the circulator with a temptation to disregard that duty. No evidence has been offered to support that speculation, however, and we are not prepared to assume that a professional circulator—whose qualifications for similar future assignments may well depend on a reputation for competence and integrity—is any more likely to accept false signatures than a volunteer who is motivated entirely by an interest in having the proposition placed on the ballot. [*Id*. at 426.]

Because the law burdened core political speech and the restriction on expression had not been justified under exacting scrutiny, the United States Supreme Court agreed with the Tenth Circuit that the prohibition was unconstitutional. *Id*. at 428.

In *Buckley v American Constitutional Law Foundation Inc (ACLF)*, 525 US 182; 119 S Ct 636; 142 L Ed 2d 599 (1999), nonprofit public interest groups in Colorado challenged several statutory requirements, including that petition circulators wear an identification badge with their name and status as a paid or volunteer circulator, as well as submit an affidavit, which was to be completed after the circulators' interaction with voters. In balancing the competing interests, the Supreme Court stated that "the First Amendment requires us to be vigilant in [separating valid provisions from speech restrictions], to guard against undue hindrances to political conversations and the exchange of ideas." *Id.* at 192, citing *Meyer*, 486 US at 421.

The *Buckley* Court cited with favor the opinion of the Tenth Circuit, which ruled that the name badge requirement "forces circulators to reveal their identities at the same time they deliver their political message," and it occurs simultaneously with the potential signor's reaction to the circulator's message, a reaction that "may be the most intense, emotional, and unreasoned." *Buckley,* 525 US at 198-199 (citing *ACLF Inc v Meyer*, 120 F3d 1092, 1102 (CA 10, 1997)). The Court distinguished the affidavit, which, unlike the badge, was not provided to the signors, and stated that it did not subject the circulator to the risk of "heat of the moment" harassment. *Buckley,* 525 US at 199. The Court determined that the badge requirement "compels personal name identification at the precise moment when the circulator's interest in anonymity is greatest." *Id.* The Court concluded that it discouraged participation in the petition circulation process by mandating disclosure of the circulator's name without sufficient justification. *Id.* While the *Buckley* Court struck the badge requirement, the Court expressly declined to decide the constitutionality of a requirement for circulators to wear a badge disclosing their volunteer or paid status. *Id.* at 200. Notably, the *Buckley* Court observed that there was real evidence that circulators were discouraged from participation by the requirement that they display name badges, noting that they had actually been subjected to harassment and possible retaliation. *Id.* at 197-200.

*Meyer* and *Buckley* make evident that exacting scrutiny is applied to the core political speech at issue in this case. Nevertheless, in neither case did the United States Supreme Court hold that no burden of any degree could ever be countenanced, or that it was absolutely impossible for a state to justify a particular burden. Our Supreme Court has explained that restrictions on core political speech may be upheld if they are "narrowly tailored to serve a compelling state interest." *In re Chmura*, 461 Mich 517, 532-534; 608 NW2d 31 (2000). The burden to establish that the law is narrowly tailored rests with the government. *Shepherd Montessori Center Milan v Ann Arbor Charter Twp*, 486 Mich 311, 319; 783 NW2d 695 (2010). Courts also weigh the need for

regulation of elections to assure a fair, honest, and orderly process. *Storer v Brown*, 415 US 724, 730; 94 S Ct 1274; 39 L Ed 2d 714 (1974).

Consequently, we weigh the sponsors' and voters' First Amendment rights against the state's asserted interests. Here, intervening defendant asserts that the state has an interest in offering information regarding the paid status of a circulator to voters when they decide whether to sign an initiative petition. We agree. Transparency in the political process, especially transparency that permits voters to "follow the money," is a compelling state interest. Giving voters knowledge of whether they are being asked to sign a petition by a volunteer or a paid circulator is valuable in its own right, but so is knowing the extent to which the petition has the funds to pay circulators. Rather than being a mere trivial curiosity, knowledge about a campaign's funding carries great weight and may have grave consequences for the public at large. See *McIntyre v Ohio Elections Comm'n*, 514 US 334, 348-350; 115 S Ct 1511; 131 L Ed 2d 426 (1995).[34] Furthermore, although *Meyer* held that the risk of intentional fraud by circulators who are paid by the signature was insufficient to justify banning paid circulators altogether, we recognize that being paid by the signature may, at a minimum, incentivize sloppiness or a lack of concern for correctness. Consequently, marking petitions circulated by paid circulators provides the state and campaigns with a valuable monitoring tool for tracking petitions that may warrant additional scrutiny. Although the phrase "transparency and accountability" is, in the abstract, somewhat vague, we are persuaded that the state has a compelling interest in ensuring that the political speech involved in circulating petitions comes with a "full disclosure" whether it is paid or volunteer.

Furthermore, the checkbox requirement, by itself, is clearly narrowly tailored. Unlike the prohibition in *Meyer*, it imposes absolutely little to no burden on circulators. Unlike the requirements in *Buckley*, circulators are not obligated to provide any personal information. We are not aware of any evidence that paid circulators are subject to harassment just for being paid; in *Buckley*, it is clear that the circulators received harassment due to the contents of the petitions. Whether they are paid or volunteer would hardly make a difference, nor would it give aggressive persons interested in retaliation any greater ability to commit such offenses. A checkbox, unlike a badge, is far less conspicuous might not even be noticed. Although amicus suggests an alternative provision generally stating that the circulator *might* be paid, such a provision would not communicate anything and would therefore not be more narrowly-tailored; rather, it would be essentially pointless. We have not been presented with any evidence that the checkbox requirement would cause paid or volunteer circulators to be disinclined to participate in circulation. Although some people might decide not to engage with circulators if they are being paid, other

---

[34] *McIntire* involved a ban on the distribution of anonymous handbills. The United States Supreme Court held that the state did not have a sufficiently compelling interest in merely providing "additional relevant information" about the distributor's identity, but the state *did* have a special interest in preventing fraud and libel during election campaigns. The United States Supreme Court held that the state's interest in preventing fraud and libel did not justify the ban, but might have justified "a more limited identification requirement." *McIntyre*, 514 US at 351-352. We think the interest here is of similar importance, and, far from imposing a ban, the "identification requirement" of the checkbox is trivial.

people might have more sympathy for a circulator they regard as merely "doing their job." Therefore, we are also not persuaded that the checkbox requirement will have a meaningful overall effect on the audience a circulator can reach.

We recognize that adding a checkbox and ensuring that it is correctly marked will impose some administrative burden on campaigns, lest, pursuant to MCL 168.482a(4), the signatures on a petition be deemed invalid. However, nothing in *Meyer*, *Buckley*, or *Chmura* suggests that no such burden is ever permissible where a compelling and legitimate state interest will be served. Indeed, *Buckley* expressly held that although potential restrictions on free speech should be regarded with skepticism and exactingly scrutiny, " 'no litmus-paper test' will separate valid ballot-access provisions from invalid interactive speech restrictions." *Buckley*, 525 US at 192. The United States Supreme Court has held, in no uncertain terms, that all election regulations have some effect on the right to vote,[35] but they are not necessarily invalid for that reason alone. *Burdick v Takushi*, 504 US 428, 434; 112 S Ct 2059; 119 L Ed 2d 245 (1992). We are not persuaded that the minimal additional administrative review, given the need to inspect petitions in any event,[36] and the added value of knowing which petitions may demand extra scrutiny, is significant. Finally, we observe that the checkbox requirement applies equally to all circulators. Even if we were to conclude that the checkbox requirement imposes some burden, it is not a significant one.[37] We therefore conclude that it passes constitutional muster.

## B. AFFIDAVIT

As discussed, in *Meyer*, the Supreme Court struck down Colorado's prohibition on the use of paid petition circulators. In its opinion, the Supreme Court acknowledged that the bar on paid circulators imposed a burden on First Amendment expression. *Meyer,* 486 US at 423. The Court took judicial notice "that it is often more difficult to get people to work without compensation than it is to get them to work for pay." *Id.,* (citation and quotation marks omitted). Also, the Court noticed "that the solicitation of signatures on petitions is work. It is time-consuming and it is tiresome, so much so that it seems that few but the young have the strength, the ardor and the

---

[35] *Burdick* emphasized that the distinction between voting-rights cases and ballot-access cases is vague, possibly bordering on nonexistent. *Burdick*, 504 US at 438.

[36] We note that, pursuant to MCL 168.482(6), which incorporates the requirements of MCL 168.544c(1) and (2), petitions must include a "certificate of circulator," including a checkbox to indicate whether the circulator is a resident of Michigan, and must bear the name and signature of the circulator. Presumably, campaigns already check this information; tracking whether the circulator is paid or volunteer would add very little further effort.

[37] We recognize that 2018 PA 608 also added a misdemeanor penalty for making a knowingly false statement regarding a circulator's status as paid or volunteer. MCL 168.482c. There is no evidence in the lower record that this penalty will discourage circulators. We further note that it is already a misdemeanor to make a false statement in the certificate of circulator. MCL 168.482e(1)(b). Indeed, the latter penalty does not include a "knowingly" requirement, and it apparently has not proven to be an impediment to obtaining circulators.

stamina to engage in it, unless, of course, there is some remuneration." *Id.* at 423-424 (citations and quotation marks omitted).

In *Buckley*, the Supreme Court rejected, on First Amendment grounds, portions of a Colorado statute requiring reports disclosing information regarding only paid petition circulators' names, addresses, and amounts paid to those circulators. *Buckley*, 525 US at 201-204. The Supreme Court held that: "[l]isting paid circulators and their income from circulation forc[es] paid circulators to surrender the anonymity enjoyed by their volunteer counterparts . . . " *Id.* at 204 (quotations omitted).[38] The Court also stated that the reporting requirements were "no more than tenuously related" to the substantial state interests that disclosure serves, and ruled that, to the extent that reports targeted paid circulators, they failed the exacting scrutiny test. *Id.* The same result should occur here.

Plaintiffs draw this Court's attention to *Buckley,* where all circulators, paid or volunteer, were to submit a signed affidavit when they submitted a petition to the Secretary of State. The affidavit required their name and address, eligibility to be a circulator, and a statement that they understood the petition laws. *Buckley,* 525 US at 188-189, 196. The *Buckley* affidavit was submitted at the time the petitions were submitted, not before. *Id.* at 196. That distinction between the affidavit in *Buckley* and the affidavit in this case is meaningful, as it supports our conclusion that the statute forces paid circulators—before a single signature is gathered—to file an affidavit that volunteer circulators are not obliged to file. The affidavit thus is not an evenhanded restriction and the state has not shown how it protects the integrity of the election process.

Intervening defendant cites *Libertarian Party of Ohio v Husted*, 751 F3d 403 (CA 6, 2014), where Ohio required a disclosure submitted to the Secretary of State with the circulator's name and address, and, if the circulator was paid, the name and address of the person employing the circulator. *Id.* at 406. In analyzing the potential chill in political speech, the Sixth Circuit noted that the disclosure was not made to the voter, but instead was made after the signatures were gathered. *Id.* at 417. The affidavit requirement here does not survive the reasoning in *Husted* because the disclosure here is made *before* the First Amendment communication can occur. It is reasonable to conclude that the requirement would have a dampening effect, an effect applying selectively to paid circulators, and one that would not inhibit volunteer circulators.

Additionally, in any petition campaign, time is of the essence. First Amendment protections have been extended to laws that encumber different stages of the speech process. See *Citizens United v Federal Election Comm'n*, 558 US 310, 336-337; 130 S Ct 876; 175 L Ed 2d 753 (2010) (describing invalid laws imposed at various stages of the speech process). 2018 PA 608's precirculation affidavit requirement will make sponsors' political speech more difficult by increasing the time required for petition drives because paid circulators cannot begin circulating petitions immediately, but instead must file affidavits before circulation can commence.

---

[38] *Buckley* is not on all fours because its legislation required the disclosure of the circulator's name and other identifying information. Nevertheless, unlike the even-handed checkbox requirement, the affidavit requirement here requires circulators to fulfill a requirement that their volunteer counterparts need not.

Further, we struggle to comprehend any compelling interest served by the affidavit, where the Michigan Campaign Finance Act, MCL 169.201 *et seq.,* requires sponsors of ballot question committees to report the names, addresses, and amounts contributed by financial supporters. See MCL 169.226(1)(b)-(j). Further, MCL 169.206(1) directs petition proponents to report whether they are hiring a firm that employs paid circulators. In light of those requirements, intervening defendant has not demonstrated that the affidavit serves a compelling interest. Conversely, *Buckley* indicated generally that free speech is inhibited by provisions that have the effect of decreasing the pool of potential circulators. *Buckley*, 525 US at 194-195.

Intervening defendant also has not shown why an affidavit relating to an individual circulator's status, rather than information from sponsors of a petition, would advance the state's interests. As discussed, we agree that the state has a legitimate and compelling interest in increasing the transparency of elections and providing accurate information to the electorate. It is not clear to us how the affidavits required by 2018 PA 608 actually advance that interest. However, even if we were to presume the affidavits did serve that interest, we must consider whether that interest can be served by "less problematic measures." *Buckley,* 525 US at 204. Assuming an affidavit disclosing the petition circulator's paid status should be required, such an affidavit should be filed at the same time as the signed petitions, rather than beforehand.[39]

It is beyond dispute that Michigan has an important interest in an orderly petition process. Intervening defendant, however, has presented very little basis for a conclusion that 2018 PA 608's requirement for a precirculation affidavit to be filed only by people who receive remuneration for their petition circulation is either necessary or substantially related to that interest. An affidavit requirement for some circulators, but not others, on the basis of whether work is paid, will result in harsher treatment for organizations that must rely on paid circulators. See *Riley v National Federation of the Blind of North Carolina, Inc*, 487 US 781, 799; 108 S Ct 2667; 101 L Ed 2d 669 (1988) (explaining that a requirement applying to only paid personnel making charitable solicitations "necessarily discriminates against small or unpopular charities" that typically rely on professional fundraisers).

Given the fact that the affidavit must be submitted before signatures may be collected, and it applies only to paid signature gatherers,[40] it can be seen as imposing a significant burden on the right of political speech protected by the First Amendment. We must balance this burden against the state's interests in election integrity. Intervening defendant has not shown that the state's interests are furthered by the disclosure requirement, which singles out only paid circulators, and burdens the sponsors' political speech by imposing a requirement that circulators must file an

---

[39] Intervening defendant has not shown that the interests of locating signatories, verifying campaign finance reporting, and assuring that employed circulators are aware of applicable laws must be accomplished by the filing of an affidavit before any signatures are gathered. Similarly, even if the focus on paid circulators is rationally related to verifying campaign-finance expenditures as argued by intervening defendant, other, less intrusive means to do so exist.

[40] That it applies only to paid circulators dilutes intervening defendant's argument that the requirement is analogous to the requirements governing precinct election inspectors under MCL 168.677, which applies to all such inspectors, not a select subset.

affidavit *before* gathering any signatures. Accordingly, the affidavit requirement does not meet the strict scrutiny standard, so we hold that it is unconstitutional.

## VI. SEVERABILITY

Portions of a statute that are found to be unconstitutional are not to be given effect if the remaining portions of the statute remain operable. See *In re Request for Advisory Opinion Regarding Constitutionality of 2011 PA 38*, 490 Mich 295, 345; 806 NW2d 683 (2011). Therefore, because courts are obliged to uphold the constitutionality of legislation to the greatest extent possible, they will not invalidate an entire act if the offending provisions can be severed from the act. *In re Certified Questions From United States Dist Court*, 506 Mich 332, 373; 958 NW2d 1 (2020). As well, courts have statutory authority to sever unconstitutional portions of statutes from the whole:

> In the construction of the statutes of this state the following rules shall be observed, unless such construction would be inconsistent with the manifest intent of the legislature, that is to say:
>
> If any portion of an act or the application thereof to any person or circumstances shall be found to be invalid by a court, such invalidity shall not affect the remaining portions or applications of the act which can be given effect without the invalid portion or application, provided such remaining portions are not determined by the court to be inoperable, and to this end acts are declared to be severable. [MCL 8.5.]

2018 PA 608 contains no express severability clause. Nevertheless, we are convinced that 2018 PA 608 can be given effect without the 15% geographic requirement, the checkbox requirement, and the precirculation affidavit. 2018 PA 608 contains other provisions that leave it operable[41] such that the entire act need not be declared unconstitutional. Further, the record reflects no indication that the Legislature would not have adopted 2018 PA 608 if it had been aware that portions of it ultimately would be found unconstitutional. See *In re Request for Advisory Opinion Regarding Constitutionality of 2011 PA 38*, 490 Mich at 345. 2018 PA 608 therefore may be read as if the offending provisions are not there. Thus, when the unconstitutional language is severed, the remainder of the act is complete in itself and is not inoperable.

## VII. CONCLUSION

We affirm the Court of Claims to the extent it struck as unconstitutional the 15% geographic requirement in sections MCL 168.471, MCL 168.477(1), and MCL 168.482(4). We

---

[41] For example, 2018 PA 608 provides that once the Board of Canvassers approves a 100-word summary of the purpose of the proposed initiative/referendum/amendment, the Board may not consider a later challenge to petitions on the basis of the summary. MCL 168.482b(1). Also, persons aggrieved by the Board's decision may file suit in our Supreme Court within seven days of the Board's determination, or no later than 60 days before the election, whichever comes first. MCL 168.479. We take no position regarding the constitutionality of those provisions, which are not before us in this appeal.

reverse the Court of Claims to the extent it found unconstitutional the checkbox requirement in MCL 168.472(7), and we reverse the Court of Claims to the extent it found constitutional the precirculation affidavit requirement of MCL 168.472(2). The parties shall bear their own costs. MCR 7.219(A).

/s/ Amy Ronayne Krause
/s/ Kirsten Frank Kelly